SAVE OUR BAYS AND BEACHES, a Hawaii non-profit corporation, sometimes doing business as Sobb; Hawaii's Thousand Friends, a Hawaii non-profit corporation; Sierra Club, a California non-profit corporation; and Surfrider Foundation, a California non-profit corporation, Plaintiffs,

v.

CITY AND COUNTY OF HONOLULU, a Hawaii municipal corporation, Defendant.

Civ. No. 92–00263 DAE.

United States District Court, D. Hawai'i.

July 27, 1994.

Denise E. Antolini, Paul P. Spaulding, III, Sierra Club Legal Defense Fund, Inc., Honolulu, HI, for plaintiffs.

Milton S. Tani, Corporation Counsel, Cheryl K. Okuma–Sepe, Deputy Corporation Counsel, City and County of Honolulu, Honolulu, HI, for defendant.

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS TO DISMISS OR FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT*

DAVID ALAN EZRA, District Judge.

The court heard the parties' cross motions for summary judgment on April 25, 1994. Paul "Skip" Spaulding, Esq., and M. Casey Jarman, Esq., appeared on behalf of the plaintiffs; Cheryl Okuma–Sepe, Esq., appeared on behalf of the defendant. After full consideration of the motions and of the supporting and opposing memoranda, and after hearing oral argument from counsel, the court GRANTS IN PART and DENIES IN PART the defendant's motions, and GRANTS IN PART and DENIES IN PART the plaintiffs' motions.

## SUMMARY OF HOLDING

This is a citizens' enforcement action brought under Section 505 of the Clean Water Act, 33 U.S.C. § 1365. In a complaint filed May 5, 1992, plaintiffs claimed that the City has repeatedly violated various conditions of the NPDES permits which regulate the discharge of treated water from the Kailua and Kaneohe Water Treatment Plants.

Counts One and Eight allege violations of secondary treatment levels as described in the Permits; Counts Two and Nine relate to alleged violations of receiving water quality standards articulated in the Permits; Counts Three and Ten concern alleged violations of bypass requirements; Counts Four and Eleven assert that the City repeatedly failed to report numerous noncompliance events; Counts Five and Twelve allege that defendant failed to monitor water quality and effluent flow as required by the Permits; Counts Six and Thirteen concern alleged violations of maintenance and operations standards contained in the Permits. Plaintiffs now move for summary judgment as to Counts One, Two, Three, Four, Five, Eight, Nine, Ten, Eleven, and Twelve; defendant has filed cross motions to dismiss or for summary judgment as to Counts Two, Three, Four, Nine, Ten, and Eleven. Defendant has also moved this court to reconsider its earlier denial of summary judgment as to Counts Six and Thirteen.

As to Counts One and Eight, the court GRANTS the plaintiffs' motion for summary judgment as to 11,095 secondary treatment violations. With respect to the City's moot-

ness defense, the court finds that, despite recent improvements made by the City, the Kailua and Kaneohe Plants are susceptible to ongoing violations. Moreover, the court finds that DOH had no authority to issue to the Kaneohe Plant an interim permit and consent order which established secondary treatment levels below the statutory minimum; Kaneohe's failure to meet statutory treatment levels results in enforceable violations. *See* Part III, *infra.*

As to Counts Two and Nine, the court GRANTS the defendant's motion to dismiss based on lack of standing. This court is bound by the recent holding of the Ninth Circuit Court of Appeals in *Northwest Environmental Advocates v. City of Portland,* 11 F.3d 900 (9th Cir.1993): citizens have no standing to enforce receiving water quality permit conditions which have not been translated into end-of-the-pipe effluent limitations. The court DENIES the plaintiffs' motion for summary judgment on these counts. *See* Part I, *infra.*

As to Counts Three and Ten, the court GRANTS the plaintiffs' motion for summary judgment as to 406 bypass violations. The court finds no merit to the defendant's contention that, because both federal and state governments are already actively enforcing these Permits, the plaintiffs' suit should be pre-empted. First, the court concludes that EPA has merely threatened enforcement in the event of future noncompliance; it is not actually enforcing the Kailua and Kaneohe Permits. Moreover, the court holds that Hawaii's statutes and regulations fail to require DOH to provide the public with notice and an opportunity to be heard concerning proposed settlements with water pollution violators. Hence, any enforcement undertaken by the State of Hawaii would not pre-empt this citizen suit. Accordingly, the court DENIES defendant's motion to dismiss or for summary judgment on these grounds. *See* Part IV, *infra.*

As to Counts Four and Eleven, the court GRANTS the plaintiffs' motion for summary

judgment as to 75 failures to report bypass incidents, 1,088 failures to report failures to monitor water quality, and 18 failures to report failures to monitor effluent flow. However, the court DENIES the plaintiffs' motion and GRANTS the defendant's motion to dismiss based on lack of standing as to the failures to report violations of receiving water quality permit conditions. *See* Part VI, *infra.*

As to Counts Five and Twelve, the court GRANTS the plaintiffs' motion for summary judgment as to 1,110 failures to monitor. Defendant has advanced no credible defenses for its monitoring failures, although its excuses will be considered at the penalty phase of this proceeding. *See* Part V, *infra.*

As to Counts Six and Thirteen, the court DENIES the defendant's Motion for Reconsideration of this court's October 27, 1992 Order concerning maintenance and operations conditions. Inasmuch as defendant's motion is based on its interpretation of the breadth of the *NWEA* holding, the court finds that interpretation erroneous, and accordingly stands by its earlier decision to deny summary judgment on these counts. *See* Part II, *infra.*

The court hereby finds that a grand total of 13,792 violations were committed by the City. The court reserves ruling on the proper penalties to be affixed.

## BACKGROUND

This is a citizens' enforcement action brought under Section 505 of the Clean Water Act, 33 U.S.C. § 1365 ("the Act"). The Act aims to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of this goal, the Act prohibits the discharge of all "pollutants"[1] from a "point source"[2] into navigable waters of the United States, unless the discharger complies with various enumerated sections of the Act. 33 U.S.C. § 1311(a). The Act specifically requires that all "publicly owned treatment

---

1. The Clean Water Act defines "pollutants" to include "sewage, garbage, [and] sewage sludge" discharged into water. 33 U.S.C. § 1362(6).

2. A "point source" is "any discernable, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

works" ("POTWs") in the United States meet effluent limitations based upon "secondary treatment" standards by July 1, 1988. 33 U.S.C. § 1311(i)(1). Secondary treatment is generally defined as removal of eighty-five percent of the organic materials and suspended solids in the wastewater leaving the plant. 40 C.F.R. § 133.102.

Plaintiffs are four non-profit organizations dedicated to preserving Hawaii's environment ("plaintiffs"). Defendant is the City and County of Honolulu ("City" or "defendant"), owner and operator of water treatment plants on the Island of Oahu. Plaintiffs' claims concern the City's Kailua and Kaneohe Wastewater Treatment Plants, which together serve the main population centers on the windward side of Oahu, from Lanikai to Heeia Pond. Plaintiffs allege that the City has failed to comply with various requirements of the Act and of the permits which regulate the plants' discharges.

## A. The Regulatory Scheme

The primary regulatory mechanism in the Clean Water Act is the National Pollution Discharge Elimination System ("NPDES"). Under this enforcement scheme, either the United States Environmental Protection Agency ("EPA") or a state entity issues NPDES permits to individual dischargers. 33 U.S.C. § 1342. The state program for issuance of NPDES permits must comply with statutory standards and regulations, must be supervised closely by EPA, and must prescribe effluent standards and limitations no less stringent than those in the Act. 33 U.S.C. § 1342(a)–(d).

Each permit issued by a federal or state agency sets forth specific limitations and con-ditions by which the permit-holder must regulate its discharge of pollutants. Courts have held that a failure to comply with a permit condition amounts to a violation of the Act itself.[3] A critical part of the regulatory scheme is a strict self-reporting system requiring permittees to monitor carefully their permit compliance and to report their own permit violations to the EPA and to the state agency which issued the permits.[4] These self-monitoring reports, known as "Discharge Monitoring Reports" or "DMRs," are public documents and are submitted under penalty of perjury. 40 C.F.R. § 122.41(k) and (1)(4).

The EPA, a state, or a private citizen can enforce violations of NPDES permits. The citizen suit provision defines exactly how and when citizens may file suit to enforce permit violations. 33 U.S.C. § 1365. Specifically, § 1365(f)(6) allows citizens to enforce "a permit or condition thereof issued under section 1342 of this title [the NPDES scheme], which is in effect under this chapter[.]"[5]

The Act imposes strict liability for NPDES violations. The Act does not allow for "de minimus" or "rare" permit violations, and the permit-holder's good faith is not relevant to the issue of liability.[6]

## B. The Permits at Issue

The State of Hawaii, Department of Health (DOH), has been delegated the responsibility of administering Hawaii's NPDES permit system. 33 U.S.C. § 1342(b). Pursuant to this authority, DOH issued NPDES permits for the wastewater plants in Kailua and Kaneohe ("the Plants"), on the Island of Oahu. On February 1, 1982,

---

3. *NRDC v. Vygen Corp.*, 803 F.Supp. 97, 103 (N.D.Ohio 1992) (reporting violations enforceable under the Act); *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1115 (4th Cir.1988) (same); *SPIRG v. P.D. Oil & Chem. Storage, Inc.*, 627 F.Supp. 1074, 1087–88 (D.N.J.1986); *U.S. v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir.1979); *Pymatuning Water Shed Citizens for a Hygienic Environment v. Eaton*, 506 F.Supp. 902 (W.D.Pa.1980), *aff'd*, 644 F.2d 995 (3rd Cir.1981) (holding conditions relating to maintenance to be enforceable).

4. *See SPIRG v. Fritzsche, Dodge & Olcott, Inc.*, 579 F.Supp. 1528, 1531 (D.N.J.1984) ("[i]n short, a discharger must report its own permit violations should they occur"), *aff'd*, 759 F.2d 1131 (3rd Cir.1985).

5. Actually, § 1365(f) defines "effluent standard or limitation." Section 1365(a)(1)(A) allows a citizen to sue anyone who is alleged to be in violation of "an effluent standard or limitation under this chapter."

6. *See Sierra Club v. Union Oil Co. of California*, 813 F.2d 1480, 1491 (9th Cir.1987) (stating that the Act and the regulations promulgated thereunder do not excuse "rare" violations).

DOH issued to the City NPDES permit No. HI 0020141 for the Kailua Plant and NPDES permit No. HI 0020150 for the Kaneohe Plant. These permits were modified on June 5, 1985 and will hereinafter be referred to as the 1985 Kailua Permit and the 1985 Kaneohe Permit.

On July 1, 1988, the secondary treatment requirements of the Act became mandatory and binding on all municipal sewage treatment works, including the Kailua and Kaneohe Plants. As of that date, these statutory requirements superseded any inconsistent provisions in the 1985 Kailua and Kaneohe Permits.

On March 6, 1990, DOH issued to the City NPDES permit No. HI 0020141 for the Kailua Plant ("1990 Kailua Permit") and NPDES Permit No. HI 0020150 for the Kaneohe Plant ("1990 Kaneohe Permit"). On or about December 19, 1990, DOH revised the 1990 Kailua Permit; on or about May 14, 1992, DOH revised the 1990 Kaneohe Permit.

The Kailua Permits authorize the City to discharge properly treated effluent (i.e., in compliance with secondary treatment standards) into the waters of the United States through the Mokapu Ocean Outfall (Serial No. 001) into Kailua Bay and through a second outfall (Serial No. 002) "when in use." The Kaneohe Permits allow the City to discharge properly treated effluent only through the Mokapu outfall.[7]

The Kailua and Kaneohe Permits impose a specific set of effluent limitations and related monitoring requirements, including limitations (measured in terms of both "mass emissions" and "concentrations") on the quantity and quality of effluent. The two primary effluent components measured are Biochemical Oxygen Demand (BOD) [8] and Total Suspended Solids (TSS) [9]. Both Permits require the Plants to remove 85% of both BOD and

TSS materials from the effluent before discharging it through the ocean outfall.

The Revised 1990 Permits set the following specific BOD and TSS limitations:

### DISCHARGE LIMITATIONS

| | Mass Emissions | | Concentration | |
|---|---|---|---|---|
| **Kailua** | | | | |
| | KG/Day Monthly Average (lbs/day) | KG/Day 7–Day Average (lbs/day) | Monthly Average | 7–Day Average |
| BOD | 795 (1752) | 1192 (2629) | 30 mg/l | 45 mg/l |
| TSS | 795 (1752) | 1192 (2629) | 30 mg/l | 45 mg/l |
| **Kaneohe** | | | | |
| BOD | 488 (1077) | 732 (1614) | 30 mg/l | 45 mg/l |
| TSS | 488 (1077) | 732 (1614) | 30 mg/l | 45 mg/l |

In addition to effluent limitations, the Kailua and Kaneohe Permits contain express prohibitions against causing violations of state water quality standards in the receiving waters and against the bypassing of sewage around treatment equipment. The Permits include extensive monitoring requirements for the Plants and the receiving waters, and specific provisions governing the reporting of noncompliance events. Additionally, the Permits expressly require the City to "comply with all conditions of this permit," and remind the City that any noncompliance will constitute a violation of the Clean Water Act and serve as grounds for enforcement.

Plaintiffs claim that the City has repeatedly violated all of the above permit conditions at both the Kailua and Kaneohe Plants. Counts One and Eight allege violations of secondary treatment levels as described in the Permits; Counts Two and Nine relate to alleged violations of receiving water quality

---

7. The Mokapu Outfall is located at a depth of approximately 100 feet, less than one mile off Mokapu Point at the northern tip of Kailua Bay. The Outfall is designed to carry the combined flows of the Kailua and Kaneohe Plants, as well as much smaller flows from the Ahuimanu and Marine Corps Base Hawaii (formerly known as Kaneohe Marine Corps Air Station) sewage plants.

8. BOD measures organic substances in sewage that bind and deplete oxygen, and thereby degrade water quality.

9. Suspended solids are solids contained in the effluent, which may serve as carriers for bacteria and viruses, cause turbidity, and lead to sedimentation of coral reefs.

standards articulated in the Permits; Counts Three and Ten concern alleged violations of bypass requirements; Counts Four and Eleven assert that the City repeatedly failed to report numerous noncompliance events; Counts Five and Twelve allege that defendant failed to monitor water quality and effluent flow as required by the Permits; Counts Six and Thirteen concern alleged violations of maintenance and operations standards contained in the Permits. Plaintiffs now move for summary judgment as to Counts One, Two, Three, Four, Five, Eight, Nine, Ten, Eleven, and Twelve; defendant has filed cross motions to dismiss or for summary judgment as to Counts Two, Three, Four, Nine, Ten, and Eleven. Defendant has also moved this court to reconsider its earlier denial of summary judgment as to Counts Six and Thirteen.[10]

### STANDARD OF REVIEW

#### I. Dismissal Under Rule 12(b)(6)

A motion to dismiss will be granted where the plaintiff fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). A complaint should not be dismissed unless it appears to a certainty that plaintiff can prove no set of facts which would entitle the plaintiff to relief. *Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 1832–33, 104 L.Ed.2d 338 (1989); *Fidelity Fin. Corp. v. Federal Home Loan Bank,* 792 F.2d 1432, 1435 (9th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987); *Stender v. Lucky Stores, Inc.,* 766 F.Supp. 830, 831 (N.D.Cal.1991). All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Stender,* 766 F.Supp. at 831.

To the extent, however, that "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Fed.R.Civ.P. 12(c).

#### II. Summary Judgment

Rule 56(c) provides that summary judgment shall be entered when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552.

Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citation omitted).

At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990).

---

10. The court notes that, just prior to the hearing date on this motion, plaintiffs filed a supplemental brief indicating the number of violations which the City has allegedly committed since the close of 1993. While the court appreciates plaintiffs' diligence, plaintiffs were not requested to file this supplemental information with the court; the court requested only that plaintiffs submit an update concerning the status of the petition for rehearing in *NWEA, infra.* Hence, the plaintiffs' filing of supplemental information relating to the 1994 violations, in the absence of leave from this court, violated Local Rule 220-4 ("Any further or supplemental briefing shall not be submitted without leave of court."). The court will accordingly disregard this information in its analysis of the City's liability.

**1108**

The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. *Id.* (citation omitted).

*DISCUSSION*

I. DO PLAINTIFFS HAVE STANDING TO ASSERT A CAUSE OF ACTION FOR WATER QUALITY VIOLATIONS (SECOND AND NINTH CAUSES OF ACTION)?

■ Every state is required to promulgate water quality standards, which must be accepted by the EPA administrator. 33 U.S.C. § 1313(a). If it is determined that water quality cannot be maintained or achieved under the normal effluent limitations,[11] the Act authorizes the imposition of stricter effluent limitations in order to attain and maintain water quality. 33 U.S.C. § 1312, 33 U.S.C. § 1311(b)(1)(C) (requiring by 1977 any more stringent standard for effluent limitations necessary to meet water quality standards); 40 C.F.R. § 122.44(d)(1)(iii).

The Act also provides an elaborate mechanism for establishing effluent limitations based on water quality standards: if the EPA finds a need to protect water quality in a given area, it will hold a public hearing. The objective of this hearing is to set the correct effluent limitation to achieve the desired water quality, in light of both the economic and social costs attendant thereto and the available technology. 33 U.S.C. § 1312. Effluent limitations are revised by the EPA after consultation with agencies and interested persons. 33 U.S.C. § 1314.

The Ninth Circuit has, in the past, recognized that "it is not the water quality standards themselves that are enforceable in section 1311(b)(1)(C), but it is the 'limitations necessary to meet' those standards, or 're-

quired to implement' the standards." *Oregon Natural Resources Council v. U.S. Forest Service,* 834 F.2d 842, 850 (9th Cir.1987). In fact, one court has expressly held that "if a state water quality standard has not been incorporated into an NPDES permit through an effluent limitation, it is outside the scope of section 301(b)(1)(C)." *McClellan Ecological Seepage Situation (MESS) v. Weinberger,* 707 F.Supp. 1182, 1200 (E.D.Cal. 1988).

■ The Permits which DOH issued to the Kailua and Kaneohe Plants contain not only end-of-the-pipe effluent limitations but also receiving water quality limitations. The first issue raised in this summary judgment motion is a question of law: do the plaintiffs, as citizens, have standing to enforce the receiving water quality limitations included in the permit?

This court's analysis is guided primarily by a recent opinion of the Court of Appeals for the Ninth Circuit, *Northwest Environmental Associates v. City of Portland (NWEA),* 11 F.3d 900 (9th Cir.1993). The question addressed by the *NWEA* court was as follows: Are expressly stated permit conditions prohibiting discharges that cause water quality violations enforceable by citizens? *NWEA* at 907. The Ninth Circuit concluded, after an exhaustive review of the legislative history and of the practical realities of enforcing water quality standards, that the 1972 amendments to the Act rendered water quality standards unenforceable by citizen suits unless they have been translated into end-of-the-pipe effluent limitations. *Id.* at 911.

In *NWEA,* the Ninth Circuit acknowledged that, while the cases it cites regarding unenforceability of water quality standards by citizens (i.e., *Oregon Natural Resources Council* and *MESS*) are factually distinguishable, they stand for the proposition that "whenever courts have been faced with the question [of enforcing water quality standards], the answer has been that citizen suits

11. An effluent limitation is measured at the source of the discharge (treatment plant) before it is released into the ocean. 40 C.F.R. § 122.2. It is a measurement and restriction of the end-of-the-pipe discharge. A state water quality standard, in contrast, is not a direct measurement of pollutant discharge. It is a measurement of surrounding ocean and is expressed in narrative and numerical form. *See* Hawaii Administrative Rules, Title 11, Department of Health, Chapter 54, Water Quality Standards.

cannot be used to enforce water quality standards." *Id.* at 907, 909. The court then emphasized that not a single case could be found in which a court held that citizen suits could be used to enforce water quality standards, "whether the water quality standards were incorporated in a NPDES permit or not." *Id.* at 907–08.

After citing the provisions of the Act which concern citizen suits and water quality standards, the *NWEA* court concluded that the following statutory scheme exists:

(1) § 1365(a) allows citizen suits to enforce effluent limitations;

(2) § 1365(f) defines effluent limitations as end-of-the-pipe limitations and permit violations;

(3) §§ 1311 et seq. establish a NPDES permit system to require end-of-the-pipe effluent limitations tailored to achieve water quality standards.

*Id.* at 908.

The *NWEA* court examined the statutory requirements for the issuance of NPDES permits, pursuant to 33 U.S.C. § 1342. After asserting that these statutory sections require pollutant dischargers to meet effluent limitations calculated to achieve water quality standards, it concluded that "none of these sections, however, require that a permittee directly comply with water quality standards. Rather, it is the duty of the permit-issuing authority to include in the permit end-of-the-pipe effluent limitations that will ensure that water quality standards are met." *Id.* (citing *Oregon Natural Resources Council,* 834 F.2d at 850).

The court then focused on the permit issued to the City of Portland. The permit stated that "notwithstanding the effluent limitations established by this permit, no wastes shall be discharged and no activities shall be conducted which will violate Water Quality Standards as adopted in OAR 340–41–445 except in the following defined mixing zone. . . ." *Id.* at 906–07 (citing 1984 Permit, E.R. 223). The court held that this permit failed to "set out such [effluent] limitations as to the CSOs (combined sewer overflows)." The court concluded that, as a result of the permit's failure to set forth water quality

standards as effluent limitations, the plaintiffs had no standing to sue under 33 U.S.C. § 1365. *Id.* at 909.

Although the court could have terminated its standing analysis at that point, it instead conducted an exhaustive analysis of the legislative history of the Act and of the 1972 amendments, which drastically altered the enforcement scheme. The court first recognized that 33 U.S.C. § 1365(f) puts no explicit limits on the types of permit conditions that citizens can enforce. *Id.* (citing 1972 U.S.C.C.A.N. at 3747) ("In addition to violations of section 301(A) citizens are granted authority to bring enforcement actions for violations of . . . any condition of any permit issued under section 402."). The court asserted, though, that this broad grant of authority did not exist in a vacuum: its breadth is in fact directly contradicted by a more limited jurisdictional statement within the same document. In this earlier statement, the Senate Committee on Public Works stated that citizens could bring enforcement actions "against those who violate effluent standards or compliance orders." *Id.* (citing 1972 U.S.C.C.A.N. at 3677).

The *NWEA* court then assessed the balance of the legislative history surrounding the 1972 amendments to the Act. Prior to 1972, the federal government used water quality standards to protect and preserve the nation's bodies of water. Under the pre–1972 legislation, the federal government could bring an enforcement action whenever it determined that water quality standards were being violated; this approach proved ineffective, though, as enforcement of water quality standards was practically non-existent. *Id.* (citing Jeffrey M. Gaba, Federal Supervision of State Water Quality Standards Under the Clean Water Act, 36 Vand. L.Rev. 1167, 1179 (1983)).

In 1972, the Act was amended, so that enforcement would focus on the quality and nature of the effluent being discharged into the receiving waters, rather than on the quality of the receiving waters themselves. While plaintiffs in this case argue that the amendments simply added end-of-the-pipe effluent limitations as an alternative enforcement measure [to the previously established

water quality standards], the Ninth Circuit found that the 1972 amendments "reflect a 180 degree shift in the government's attempts to control water pollution." *Id.* at 909. In essence, the court determined that end-of-the-pipe effluent limitations completely replaced water quality standards as enforcement measures. Water quality standards remain only a goal which end-of-the-pipe limitations strive to reach:

> This change in emphasis to an act geared towards discharge limits is reflected throughout the legislative history. *See, e.g.,* 1972 U.S.C.C.A.N. 3675 ("The legislation recommended by the Committee proposes a major change in the enforcement mechanism of the Federal water pollution control program from water quality standards to effluent limits."). Although the 1972 Amendments retain some role for water quality standards, *see* 33 U.S.C. § 1312 and 1313, that role has changed. Prior to 1972, water quality standards served as both the end goal and the mechanism for achieving that goal. *Under the 1972 Amendments, water quality standards remain the goal, however discharge limits have taken over as the mechanism. See* 1972 U.S.C.C.A.N. 3675 ("The basis of pollution prevention and elimination will be the application of effluent limitations. *Water quality will be a measure of program effectiveness and performance, not a means of elimination and enforcement.*").

*Id.* at 909–10 (emphasis added).

The court then gave several examples from the legislative history in which legislators and policy-makers described the use of water quality standards as the goal to be reached through enforcement of end-of-the-pipe effluent limitations. *Id.* at 910 (citations omitted). These examples also emphasize that 33 U.S.C. § 1313, which assigns the new role to water quality standards, was intended as a means "to determine if more restrictive effluent limitations may be required" [12]; this section does not "weaken the effluent limitation approach and [restore] the old water

quality standard based approach to water quality control[.]" [13]

The *NWEA* court discussed the reasons for the switch in enforcement mechanisms. *Id.* at 910–11. It first noted the difficulty litigants had experienced in proving that a defendant's discharges were in fact the cause of poor water quality in the receiving waters, where the water received discharges from more than one plant. The effluent limitation enforcement scheme was designed to give the courts a simpler, more objective task:

> Now in order for the court to determine liability, it need only compare the quality and quantity of the alleged polluter's discharge to the limits set forth in the applicable NPDES permit. If the discharges exceed the permit limits, the discharger has violated the Act; if they do not, there is no violation or liability.

*Id.* at 910.

Although the plaintiffs in this case contend that water quality standards, when listed as a permit condition, provide a second or alternative measurement by which a court can find liability, the *NWEA* court rejected this "alternatives" argument as contrary to purpose of the amendments: "The enforcement of a general water quality maintenance condition in a permit, however, would require the court to engage in just the subjective analysis of technological considerations that Congress sought to avoid under § 1365." *Id.* (citing 1972 U.S.C.C.A.N. at 3745 ("An alleged violation of an effluent control limitation or standard, would not require reanalysis of technological in [sic] other considerations at the enforcement stage. These matters will have been settled in the administrative procedure leading to the establishment of such effluent control provision.")).

The Ninth Circuit also considered the practical problems inherent in the "alternative enforcement" scheme suggested by the plaintiffs. It asserted that such an approach would place modern dischargers under the

---

12. *See* Sen. Consideration of the Report of the Conference Committee, reprinted in 1 A Legislative History of the Water Pollution Control Act Amendments of 1972 (1972) (Legislative History) at 171 (statement of Sen. Muskie).

13. *See* House Consideration of the Rept. of Conf. Comm. reprinted in Legislative History at 246 (statement of Sen. Harsha).

same disadvantage faced by pre–1972 dischargers: the legality of their actions would be "dependant [sic] on natural conditions such as the weather and third parties' discharges." *Id.* (citation omitted). Thus, in light of the multitude of other factors which affect water quality standards in the receiving waters, no amount of planning or care could protect a discharger from potential liability. The court found this strict liability approach both unfair and untenable: "[g]iven the extreme cost of pollution abatement," dischargers (i.e. industries and cities) must have the ability to plan for the future with the assurance that, through such planning, they can keep themselves "on the correct side of the law." *Id.* at 911.

The *NWEA* court summarized its review of the legislative history as follows: the 1972 amendments (1) instructed courts to make liability determinations objective and non-technical, and (2) emphasized that water quality standards should be translated into end-of-the-pipe effluent limitations. In light of these instructions, the *NWEA* court was "convince[d] ... that the single reference to 'any condition of any permit' cannot be read as broadly as NWEA suggests without eviscerating Congress's intent to restructure and revamp the statute.... Given the legislative history and the practical problems that NWEA's interpretation of the statute would entail, the court finds that under 33 U.S.C. § 1365, water quality standards are unenforceable by way of citizen suit unless they have been translated into end-of-the-pipe effluent limitations." *Id.* Accordingly, the Ninth Circuit affirmed the district court's finding that the plaintiffs lacked federal jurisdiction to enforce the water quality conditions of the NPDES permits.

This court must now examine the case before it to determine whether the *NWEA* holding controls. Plaintiffs, in addition to arguing that the Ninth Circuit's holding in *NWEA* is absolutely incorrect,[14] contend that several distinctions exist between this case and *NWEA* which compel this court to reach a different result from that reached in *NWEA.* After a careful review of the points raised by plaintiffs, this court finds those distinctions insufficient to place this case beyond the reach of *NWEA* 's broad holding. Consequently, the court must dismiss the claims relating to water quality standards [15] because the plaintiffs have no standing to assert those claims in a citizen suit in federal court. The court accordingly grants defendant's motion to dismiss and denies plaintiffs' motion for summary judgment as to these counts.

Plaintiffs primarily assert that, unlike the permit at issue in *NWEA,* the permits held by the Kailua and Kaneohe Plants contain specific water quality standards (described by the plaintiffs as "quantitative conditions"). The *NWEA* permit merely incorporated by reference the statutory water quality standards enacted by the State of Oregon (described by the plaintiffs as "narrative conditions"). The plaintiffs view this distinction as significant for two reasons: first, the *NWEA* holding as to "narrative conditions" should not affect specific water quality ("quantitative") permit conditions, and second, the practical problems cited by the *NWEA* court would not exist here because the permit conditions at issue are specific, well designed

---

**14.** The plaintiffs emphasize that *NWEA* is the first appellate case to ever hold a permit condition unenforceable under any environmental statute.

Secondly, according to the plaintiffs, many of the cases relied on by the Ninth Circuit were factually distinguishable because they involved "non-point source pollution", as opposed to "point source pollution." Point source pollution essentially includes all discharges from pipes, channels, or other confined conveyances, and are regulated through the NPDES permit program in 33 U.S.C. § 1342. In contrast, non-point sources include runoff from farms, mines, construction sites, and timber cutting. Nonpoint sources are not regulated through the permit

program, but are instead addressed in the Act by three different land use planning processes. *See* 33 U.S.C. §§ 1313(e), 1288, 1281. Plaintiffs argue that the *NWEA* court should not have relied on non-point source cases to determine standing in a point source case.

Finally, the plaintiffs mention that the status of *NWEA* is shaky. They emphasize the vigorous dissent by Judge Pregerson, and caution that there is a petition pending for rehearing en banc. As of the date and time of this order, that petition has not been granted.

**15.** These are the Second (Kailua) and Ninth (Kaneohe) claims for relief in the complaint.

and easily enforced. The court will address each of these in turn.

### A. Narrative Versus Quantitative Conditions

While it is true that the permit at issue in *NWEA* incorporated by reference Oregon's statutory water quality standards, the *NWEA* court did not, as the plaintiffs do, distinguish narrative conditions from quantitative ones. There is no indication that the Ninth Circuit found the permit condition objectionable because it contained only a narrative condition, or limited its holding to only narrative conditions. In fact, in its analysis of the legislative history and the practical problems posed by water quality standard enforcement measures, the court repeatedly used the generic phrases "permit" or "permit condition", unqualified by the words "narrative" or "incorporated by reference". For example, the court's conclusion that "[t]he permit at issue in the instant case fails to set out such limitations as to the CSOs" [16] indicates that the water quality standards contained in the permit are objectionable because they have not been translated into end-of-the-pipe effluent limitations. The court does not even suggest that the standards are unenforceable because they have been incorporated by reference to the statute, rather than made explicit.

The *NWEA* court's intent to render unenforceable all water quality standard permit conditions (which have not been translated into end-of-the-pipe effluent limitations) is even more apparent in the following statements:

> The enforcement of a general water quality maintenance condition in a permit, however, would require the court to engage in just the subjective analysis of technological considerations that Congress sought to avoid under § 1365. Congress's emphasis on the evidentiary simplicity of enforcement actions precludes the enforcement of water quality standards that have not been translated into effluent discharge limitations.

*Id.* at 910.

[T]his court [is convinced] that the single reference to "any condition of any permit"

cannot be read as broadly as NWEA suggests without eviscerating Congress's intent to restructure and revamp the statute. . . . [T]he court finds that under 33 U.S.C. § 1365, water quality standards are unenforceable by way of a citizen suit unless they have been translated into end-of-the-pipe effluent limitations.

*Id.* at 911.

Plaintiffs present to the court various authorities to support their position that water quality permit conditions should be enforced in spite of the *NWEA* holding. First, plaintiffs cite many cases in which courts have allowed citizens to enforce permit conditions pursuant to § 1365(f). *NRDC v. Vygen Corp.*, 803 F.Supp. 97, 103 (D.Ohio 1992) (holding reporting violations enforceable under the Act); *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1115 (4th Cir.1988) (same); *SPIRG v. P.D. Oil & Chemical Storage, Inc.*, 627 F.Supp. 1074, 1087–88 (D.N.J. 1986); *U.S. v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir.1979); *Pymatuning Water Shed Citizens for a Hygienic Environment v. Eaton*, 506 F.Supp. 902 (W.D.Pa.1980), *aff'd*, 644 F.2d 995 (3rd Cir.1981) (holding conditions relating to maintenance enforceable); *Connecticut Fund for Envir. v. Raymark Industries*, 631 F.Supp. 1283, 1285 (D.Conn.1986) (holding condition regulating discharge into a lagoon to be enforceable). None of these cases, however, specifically hold that a water quality condition in a permit is enforceable.

Plaintiffs do cite an unpublished opinion from the Northern District of California, in which Judge Patel held enforceable water quality standards found in the permit. *U.S. v. Louisiana–Pacific Corp.*, Cv. No. C 78–0567 (N.D.Cal.1990). While the court appreciates Judge Patel's analysis of the issue, it notes that unpublished opinions cannot be used as authority in either the district or appellate courts. Ninth Circuit Rule 36–3. Additionally, while *Louisiana–Pacific* was not specifically referenced by the Ninth Circuit in *NWEA*, it would appear that the 1993 *NWEA* opinion supersedes and implicitly

---

**16.** *NWEA*, 11 F.3d at 909.

overrules Judge Patel's 1990 holding as to the enforceability of the water quality permit condition.

Finally, the plaintiffs align themselves with Judge Pregerson in his dissent in *NWEA*. As Judge Pregerson interprets the legislative history, the 1972 amendments to the Act were intended "to improve enforcement, not to supplant the old system." *NWEA*, 11 F.3d at 912 (Pregerson, J., dissenting). He points out that certain water quality standards cannot be expressed as effluent limitations, and that the regulatory scheme allows states to express criteria "'as constituent concentrations, levels, or narrative statements....'" *Id.* (Pregerson, J., dissenting) (citing 40 C.F.R. § 131.3(b) (1992)). Judge Pregerson also asserts that the Act permits states to adopt stricter controls than those implemented by the federal government under the Act. *Id.* (Pregerson, J., dissenting) (citing 33 U.S.C. § 1370).

However, in determining whether the *NWEA* holding applies to the case presently pending, the court cannot ignore that Judge Pregerson dissents specifically because he objects to the breadth of the majority's language: "By interpreting § 1365(a)(1) to exclude citizen suit enforcement of water quality standards that are not translated into quantitative [end-of-the-pipe] limitations, the majority opinion immunizes the entire body of qualitative regulations from an important enforcement tool." *Id.* (Pregerson, J., dissenting). Thus, Judge Pregerson interprets the majority opinion as applying not only to narrative conditions, but to all water quality permit conditions which have not been translated into end-of-the-pipe effluent limitations. Such is the condition at issue in the Kailua and Kaneohe Permits. Judge Pregerson's dissent therefore contributes to this court's

finding that *NWEA* compels the outcome of the standing issue in this case.

In short, despite plaintiff's claims to the contrary, there is not a single statement in the *NWEA* opinion which can be construed as limiting the holding to permits containing narrative water quality conditions. In light of the *NWEA* court's extensive consideration of legislative history and the realities of Clean Water Act litigation, it is not for this court to limit the Ninth Circuit's decision to the facts before it.[17]

**B. *Practical Enforcement Problems***

The court now turns to the plaintiffs' contention that the water quality standards in the Kailua and Kaneohe Permits would not cause practical enforcement problems, and should therefore be enforced despite the holding in *NWEA*. According to the plaintiffs, the permit conditions for the pollutants at issue (ammonia nitrogen and enterococcus) are specific, well designed and easily enforced. The Permits specify the location and monitoring protocols for these pollutants and allow the City to be excused from violations if the City can prove that the violation was not due to the influence of its discharge on the receiving waters. Thus, according to the plaintiffs, the City has both a permit provision and a scientific methodology built into the Permits to avoid liability for violations, and is thereby protected from arbitrary enforcement.

The court agrees that, because the Kailua and Kaneohe Permits explicitly allow the dischargers to escape liability for violations caused by others, they are distinct from those at issue in *NWEA*. However, this distinction does not render the permit condition enforceable. First, under the law, lack of causation has historically been a defense available to all dischargers.[18] The provision

17. This court, in deciding the cases before it, is bound to follow existing precedent; it cannot speculate as to the future actions and decisions of the Court of Appeals for the Ninth Circuit.

18. However, proof problems arose when water quality standards were used for enforcement; courts had difficulty determining who, among various dischargers, caused the violation. Congress acknowledged this difficulty in 1972, when it amended the Act to establish effluent limita-

tions as the new enforcement mechanism in order to facilitate liability determinations:

Such direct restrictions on discharges facilitate enforcement by making it unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible and which must be abated.

*EPA v. State of California*, 426 U.S. 200, 204, 96 S.Ct. 2022, 2024, 48 L.Ed.2d 578 (1976).

in the Kailua and Kaneohe Permits which expressly exempts a discharger from liability for violations he does not cause simply internalizes the statutory and common law liability; it does not give the dischargers an extra form of protection.

In addition, even if this court were to determine that the permits provide a more reliable means of determining causation, and therefore offer the dischargers a greater degree of protection than the permits considered in *NWEA,* the breadth of *NWEA*'s holding still prevents citizen enforcement of the water quality conditions. The Ninth Circuit, in deciding whether the legislative history supported its finding that plaintiffs lacked standing to sue, addressed these practical concerns as *one prong* of its analysis: "Practical considerations also militate in favor of an interpretation that does not allow for jurisdiction in this case." *NWEA,* 11 F.3d at 910. The court does not state that its holding rests on its assessment of the practical realities of enforcement and planning, nor does it imply that such an assessment is a crucial element of the standing determination.[19] Instead, the "practical considerations" segment, while important, appears simply to lend support to the majority's conclusion. Hence, a contrary finding by this court as to the practical realities faced by the dischargers neither necessitates nor warrants a contrary finding as to standing.

### C. *Estoppel*

■ Next, the plaintiffs contend that the defendant should be estopped from complaining about the Permits for two reasons. Plaintiffs first assert that, because defendant failed to challenge the Permits when they were issued, it has lost "forever the right to do so." *Public Interest Research Group of New Jersey v. Powell Duffryn Terminals,* 913 F.2d 64, 78 (3rd Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); *Connecticut Fund for the Envir. v. Job Plating Co., Inc.,* 623 F.Supp. 207, 216 (D.Conn.1985) ("By failing to challenge its NPDES permit under state law at a time

when its purported legal deficiency should have been apparent to the defendant as it is now, the defendant is precluded from doing so in this action.").

The court agrees that, had the defendant known of any deficiencies when the Permits were issued, it would have been required to challenge them at that time. However, this principle does not estop the City from raising this issue now, for two reasons. Until the Ninth Circuit determined seven months ago that the water quality condition could not be enforced in a citizen suit, there was no "apparent legal deficiency" in the Permits of which the defendant should have been aware. As the plaintiffs note, there is ample case law to support the enforceability of any permit condition. Moreover, the holding of *NWEA,* and the holding of this case, address only the enforceability of this provision in a citizen suit: this case has no bearing on the ability of a federal or state agency to enforce the Permits. This court does not hold that the water quality condition is deficient in and of itself; the condition is simply not susceptible to enforcement by private citizens.

The second estoppel argument is based on jurisdiction: plaintiffs assert that only state courts can review the validity of a state-issued NPDES permit. *Municipal Authority of the Borough of St. Mary's v. U.S.E.P.A.,* 945 F.2d 67, 71 (3rd Cir.1991); *American Paper Institute, Inc. v. U.S.E.P.A.,* 890 F.2d 869, 875 (7th Cir.1989); *Shell Oil Co. v. Train,* 585 F.2d 408 (9th Cir.1978). Thus, according to the plaintiffs, this court can only enforce the Permits; the defendant cannot challenge, and this court cannot review, the Permits' validity. The court agrees with plaintiffs' characterization of this court's jurisdiction, but reaffirms that neither the Ninth Circuit in *NWEA* nor this court holds the permit condition invalid on its face. Instead, this court has limited its review to the enforceability of the water quality condition by citizens.

In sum, this court must follow *NWEA*'s holding that plaintiffs lack standing to enforce, through a citizen suit, the water quali-

---

**19.** In fact, the practical considerations paragraph is the very last piece of the *NWEA* court's extensive analysis. In light of its placement in the opinion, this court is hesitant to find that the Ninth Circuit placed great importance on this aspect of the case in finding lack of standing.

ty permit conditions which have not been translated into end-of-the-pipe effluent limitations. This court grants the defendant's motion to dismiss, and denies the plaintiffs' motion for summary judgment, as to Counts Two and Nine of the Complaint.

## II. DO PLAINTIFFS HAVE A CAUSE OF ACTION FOR MAINTENANCE AND OPERATIONS CONDITIONS (THE SIXTH AND THIRTEENTH CAUSES OF ACTION)?

The second element of Defendant's Third Motion to Dismiss or for Summary Judgment alleges that plaintiffs have no standing to assert claims for violation of the maintenance and operations conditions of the Kailua and Kaneohe Permits. The defendant had previously raised this issue in its Motion to Dismiss or in the Alternative for Summary Judgment or Partial Summary Judgment dated July 27, 1992. In its Order dated October 27, 1992 ("1992 Order"), this court denied defendant's motion as to this claim.[20] Defendant has refiled this motion, asking the court to reconsider its decision in light of the Ninth Circuit's decision in *NWEA*.

█ The disposition of a motion for reconsideration is within the discretion of the district court and will not be reversed absent an abuse of discretion. *Plotkin v. Pacific Tel. & Tel. Co.,* 688 F.2d 1291, 1292 (9th Cir.1982). There is a "compelling interest in the finality of judgments which should not be lightly disregarded." *Rodgers v. Watt,* 722 F.2d 456, 459 (9th Cir.1983).

It is well settled in the Ninth Circuit that a successful motion for reconsideration must accomplish two goals. First, a motion for reconsideration must demonstrate some reason why the court should reconsider its prior decision. Second, a motion for reconsidera-

tion "must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Painting Ind. of Hawaii v. U.S. Dept. of Air Force,* 756 F.Supp. 452 (D.Haw.1990) (citations omitted). Courts have established only three grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the discovery of new evidence not previously available; and (3) the need to correct clear or manifest error in law or fact, to prevent manifest injustice. *Id.* The District of Hawaii has implemented these standards in Local Rule 220–10.

█ According to the defendant, *NWEA* constitutes a change in the controlling law which compels the court to revise its earlier finding. In the defendant's reading of *NWEA,* the Ninth Circuit held that the *only* permit provision on which a citizen can bring an action is the effluent limitation condition. Defendant claims that the legislative history cited by the *NWEA* court fails to support a claim for a violation based on operations and maintenance permit conditions. Consequently, this court would violate the legislative intent of the Clean Water Act, as described in *NWEA,* if it allowed plaintiffs to raise operations and maintenance issues as grounds for enforcement.

The court disagrees with defendant's reading of *NWEA.* As discussed extensively in Part I, *supra,* the *NWEA* court decided only the issue of whether water quality permit conditions could form the basis of a citizen suit where they had not been translated into effluent limitations. It neither considered nor made reference to the relationship between effluent limitations and other types of permit conditions as potential grounds for enforcement. It therefore cited only the leg-

---

**20.** In its 1992 Order, this court held that the plaintiffs satisfied the notice requirements established in 33 U.S.C. § 1365(b)(1)(A) as to all of the claims in the complaint. The Order also addressed defendant's motion for summary judgment as to the maintenance and operations claims, which was based on defendant's allegation that plaintiffs had failed to demonstrate that defendant had violated an alleged "objective standard" within the Act. The court held that the Act does not require that violation of an objective standard be alleged, and that defen-

dant's misguided reading of the legislative history would read the maintenance and operating requirements out the NPDES permits issued to Kailua and Kaneohe.

Defendant repeats those arguments in the instant motion, contending that the *NWEA* opinion changes the legal analysis required. For the reasons stated below, the court disagrees and reaffirms its 1992 Order denying summary judgment as to the maintenance and operations claims.

islative history relevant to the water quality standard/effluent limitation debate and did not mention the body of legislative materials surrounding other provisions of the NPDES enforcement scheme. In short, defendant completely overstates the breadth of the *NWEA* opinion by claiming that, because the Ninth Circuit explicitly disallowed citizen enforcement of water quality permit conditions in favor of enforcement based on effluent limitations, it necessarily prohibited citizen enforcement of all permit conditions other than effluent limitations.

The Ninth Circuit's decision in *NWEA* in no way changed the law regarding the enforcement of maintenance and operation permit conditions. Accordingly, the court denies defendant's motion to reconsider its prior ruling denying defendant's Motion to Dismiss or for Summary Judgment as to the Maintenance and Operations Claims.

III. SUMMARY JUDGMENT AS TO DEFENDANT'S ALLEGED FAILURE TO MEET SECONDARY TREATMENT LEVELS AT THE PLANTS (FIRST AND EIGHTH CLAIMS FOR RELIEF)

A. *Have the Plaintiffs Satisfied the Gwaltney Doctrine?*

The Supreme Court determined in *Gwaltney of Smithfield, Inc. v. Chesapeake Bay Foundation,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), that citizens cannot bring suits to enforce "wholly past violations." This ruling requires that citizens allege "ongoing violations" of the Act, not just violations that had completely ceased at the time the lawsuit was filed.

In its 1992 Order, this court unequivocally held that the allegations in plaintiffs' complaint satisfied the requirements of *Gwaltney:*

> *Gwaltney,* however, does not require, as the City contends, that a plaintiff prove that a defendant is in violation of the Act at the time of the commencement of the suit. Rather, all that is required is that a defendant be alleged to be in continuous or

intermittent violation of the Act. Any other construction of § 505 reads the word "alleged" out of the Act. (citations omitted).

> Paragraphs 6 and 58 of plaintiffs' complaint contain specific allegations that the City's conduct is of an ongoing nature. As such, it satisfies the requirement of § 505 as interpreted by *Gwaltney.*

1992 Order at 12; *see also Sierra Club v. Union Oil Co. of California (Union Oil II),* 853 F.2d 667, 670 (9th Cir.1988) ("Sierra Club had to make good faith allegations of continuous or intermittent ongoing NPDES permit violations for jurisdiction to attach.").

■ The Ninth Circuit has explained that the phrase "ongoing violations" in *Gwaltney* is a term of art that requires the plaintiff to show that there exists a reasonable likelihood of intermittent or sporadic violations in the future:

> [A] citizen plaintiff may prove ongoing violations either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.

*Union Oil II,* 853 F.2d at 671. Moreover, "[i]ntermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition." *Id.* (citing *Chesapeake Bay Foundation v. Gwaltney, (Gwaltney II)* 844 F.2d 170, 172 (4th Cir. 1988)).

■ In assessing whether there are "ongoing violations," a court may consider any remedial actions taken by the defendant and "any other evidence [21] presented during the proceedings that bears on whether the risk of defendant's continued violation had been completely eradicated when the citizen plaintiffs filed suit." *Union Oil II,* 853 F.2d at 671. Significantly, the court's assessment of the likelihood of future violations should begin with the date on which the complaint was filed; the court is not to view the likelihood of continuing violations from its present vantage-point. *Chesapeake Bay Foundation v.*

---

**21.** Post-complaint violations can constitute hard evidence of "ongoing violations." *Sierra Club v.*

*Union Oil Co. of California (Union Oil III),* 716 F.Supp. 429, 433 (N.D.Cal.1988).

*Gwaltney,* (*Gwaltney III* ) 890 F.2d 690, 693 (4th Cir.1989) (finding that proper point for which to assess the likelihood of continuing violations is not the present, with its advantage of hindsight, but the time of the original suit); *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1134–35 (11th Cir.1990) (stating that the court must always look to the date the complaint was filed).

 This court has already determined that the plaintiffs had no duty to actually prove the existence of an ongoing violation at the time they filed the complaint; their allegations thereof, if reasonable and made in good faith, are sufficient to invoke this court's jurisdiction. *See* 1992 Order at 12. The court must now determine whether, as of May 5, 1992,[22] a reasonable trier of fact could have found ongoing violations (either continuing violations or likelihood of recurring intermittent or sporadic violations) by the City.[23]

The City primarily argues that, in December of 1991, it had installed a "new upgraded trickling filter process" which would provide secondary treatment at the Kailua Plant. The City claims that, since the new filter was installed, the Kailua Plant has been in compliance with secondary treatment requirements. Hence, according to the City, the plaintiffs' allegations of future violations were groundless.

The plaintiffs acknowledge that the City made improvements to the trickling filter in December of 1991. However, the plaintiffs have presented substantial evidence that the new filter, at the time of its installation, could not and was not expected to, "completely eradicate the risk" of future secondary treatment violations. *Union Oil II,* 853 F.2d at 671. Plaintiffs cite three fundamental problems at the Kailua Plant which experts believed, as of May 5, 1992, were reasonably likely to continue despite the new filter.

First, plaintiffs offer unrefuted evidence that the Kailua Plant was unable to handle the substantial flows which resulted during periods of heavy rainfall. Although flows as high as 34 million gallons per day (MGD) were recorded as recently as March 1991 and are expected to continue,[24] the Plant operator admitted in a deposition that the Plant could not handle more than 18 MGD.[25] When the Kailua Plant is unable to handle the increased flow, the sewage has to be re-routed (bypassed) to alternative outfalls. In a letter dated October 22, 1991, the Chief Engineer of the Kailua Plant indicated to DOH that "perennial bypassing has been occurring when intense rainfalls result in high flows." [26] These emergency bypasses have, in the past, led to permit violations.[27]

Furthermore, while the plant may recently have achieved technical compliance, there is no indication that the new filter completely eradicated the risk that the Kailua Plant would be unable to handle exceptionally heavy rainfall. In March of 1992, four months after the new filter was installed, a consultant to the City confirmed that bypassing would still be required at flows of over 24 MGD.[28] The anticipated failure of the new filter to manage flows exceeding 24 MGD signifies that, as of May 5, 1992, similar bypassing problems were likely to occur in the future.[29]

---

22. The complaint was filed on May 5, 1992.

23. The court notes that the City has raised the *Gwaltney* defense only as to the Kailua Plant. The court will therefore limit its discussion to the likelihood of continuing, intermittent, or sporadic violations at the Kailua Plant.

24. *See* Exhibit "6" to Plaintiffs' Reply Memorandum to Related Motion at 2–3.

25. *See* Exhibit "8" to Plaintiffs' Reply Memorandum to Related Motion at 26.

26. *See* Exhibit "4" to Plaintiffs' Reply Memorandum to Related Motion.

27. *See* Part IV, *infra.*

28. *See* Exhibit "5" to Plaintiffs' Reply Memorandum to Related Motion (Ahuimanu–Kaneohe–Kailua Infiltration/Inflow Report, prepared by Barrett Consulting Group, March of 1992) (reporting that the maximum capacity flow that can normally be handled by the Kailua Plant is 12 MGD; when the trickling filter is used, 24 MGD can be accommodated).

29. *See* Bell Declaration at ¶¶ 13–14; Exhibit "4" to Plaintiffs' Reply Memorandum to Related Motion (October 22, 1991 Letter from Chief Engineer to DOH, admitting that "bypassing is anticipated to continue until such time that the high

Second, plaintiffs have produced uncontroverted evidence that the Kailua Plant lacks "redundancy" in its treatment units: it has only one major component for each of its major treatment processes. The Director and Chief Engineer of the Kailua Plant specified that "[t]he facility has no redundant primary or secondary treatment units."[30] As a result, whenever a single piece of equipment fails, no replacements are available, thereby causing the Plant to bypass some or all of the treatment units on a temporary basis.[31] In a letter dated December 20, 1991, the Chief Engineer characterized the Plant as "a maintenance nightmare due to a lack of redundant facilities." *See* Exhibit "2" to Plaintiffs' Reply Memorandum to the Related Motion (letter from Sam Callejo to John Felix, Chair of the Public Works and Safety Committee). Significantly, this letter was written at exactly the same time the new filter was installed. Defendant has produced no other evidence of improvements or new machinery which might have increased the redundancy of the Plant. Hence, there is no indication that, as of May 5, 1992, the new filter (or any other innovations) corrected or even ameliorated the redundancy problem.

Third, plaintiffs have demonstrated that the Kailua Plant has a "weaker than normal influent" (influent with lower than average concentrations of BOD and TSS).[32] As a result, in order to meet the Act's 85% removal requirement, Kailua's sewage requires a high degree of treatment. Kailua had, in the past, experienced difficulty meeting this 85% requirement, and was not expected to reach compliance even with the new trickling filter installed in December of 1991. In the September 1991 Memorandum to the Head of the Planning and Public Service Branch cited above, the Superintendent of the Wastewater Treatment and Disposal Branch expressed

his fear that, due to the medium to weak influent, "we do not anticipate consistently meeting the 85 percent removal efficiency requirements even though we may meet the 30/30 mg/l concentration limitations." The Superintendent also indicated that his office had failed in its attempt to convince DOH to remove or delete the 85% five-day BOD and TSS removal efficiency requirements for the Kailua Plant. *See* Exhibit "3" to Plaintiffs' Reply Memorandum to the Related Motion. These difficulties were corroborated by the Chief Engineer of the Kailua Plant, who asserted in his December 20, 1991 letter that "[t]he plant, as it operates today, will not meet the requirements of secondary treatment as defined in the Clean Water Act." *See* Exhibit "2" to Plaintiffs' Reply Memorandum to the Related Motion. The predictions of these insiders that the Kailua Plant was unlikely to meet the 85% removal requirement provide a solid basis for plaintiffs' beliefs that, as of May 5, 1992, the risk of future noncompliance was significant.

For the foregoing reasons, the court finds well-supported the plaintiffs' allegation that, on May 5, 1992, there was a significant risk of future violations by the Kailua Plant. Despite defendant's assertions regarding its success, defendant's installation and improvement of the trickling filter did not "completely eradicate" the risks of bypass, redundancy, and removal problems as of May 5, 1992. Plaintiffs thus satisfy the requirements of *Gwaltney,* and can present evidence of violations by the Kailua Plant.

B. *Should the Kailua Plant Claims Be Dismissed as Moot?*

The City contends that, because it has installed the new trickling filter in the Kailua Plant and because the Kailua Plant has not committed any secondary treatment viola-

flows caused by the rains can be reduced. These incidents are the results of shortcomings with the existing systems").

**30.** In a letter from Chief Engineer to PTA President of Aikahi Elementary School PTA, dated November 7, 1991, the author admits that the Kailua Plant lacks redundant facilities which necessitates bypassing in times of repairs. *See* Exhibit "7" to Plaintiffs' Reply Memorandum to Related Motion.

**31.** *See* Bell Declaration at ¶ 16.

**32.** *See* Exhibit "3" to Plaintiffs' Reply Memorandum to Related Motion. This September 6, 1991 Memorandum from the Superintendent of the Wastewater Treatment and Disposal Branch to the Head of the Planning and Public Service Branch states: "[T]he strength of the influent is typically considered medium to weak[.]"

tions in the last two and a half years, the plaintiffs' claim for injunctive relief is moot. The City also argues that, because the problems of which the plaintiffs complain were solved before the complaint was filed, the plaintiffs' prayer for civil penalties is also moot.

■ Subject matter jurisdiction is determined with respect to circumstances at the time the complaint is filed. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 570 n. 4, 112 S.Ct. 2130, 2141 n. 4, 119 L.Ed.2d 351 (1992). Post-filing events cannot, therefore, strip a court of its properly conferred jurisdiction. *Natural Resources Defense Council v. Texaco Refining & Marketing, Inc.,* 2 F.3d 493, 503 (3d Cir.1993).

■ Nonetheless, the doctrine of mootness precludes a court from adjudicating claims that no longer present a concrete and substantial controversy which can be redressed through specific relief. *See U.S. v. Michigan Nat'l Corp.,* 419 U.S. 1, 4, 95 S.Ct. 10, 11, 42 L.Ed.2d 1 (1974). A defendant bears a "heavy burden" to prove that a lawsuit is moot. *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *Northwest Environmental Defense Center v. Gordon,* 849 F.2d 1241, 1244 (9th Cir.1988). The Supreme Court has emphasized that a defendant asserting mootness must demonstrate that it is *"absolutely clear"* that the alleged wrongful behavior could not reasonably be expected to recur." *Gwaltney of Smithfield v. Chesapeake Bay Foundation,* 484 U.S. 49, 66, 108 S.Ct. 376, 386, 98 L.Ed.2d 306 (1987) (emphasis in the original); *U.S. v. Concentrated Phosphate Export Ass'n, Inc.,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). In addition, the Supreme Court has distinguished between mootness of the entire case and mootness of one form of relief:

> Where several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests.... [T]he remaining live issues supply the constitutional requirement of a case or controversy.

*Powell v. McCormack,* 395 U.S. 486, 496–97 n. 8, 89 S.Ct. 1944, 1951 n. 8, 23 L.Ed.2d 491 (1969).

■ While the Supreme Court in *Gwaltney* did not specifically address whether mootness bars damage claims in addition to claims for injunctive relief, the appellate courts which have ruled on the matter have answered the question in the negative: In Clean Water Act cases, the mooting of injunctive relief does not moot a plaintiff's prayer for civil penalties and thus does not moot the case as a whole. *Natural Resources Defense Council v. Texaco Refining & Marketing, Inc.,* 2 F.3d 493, 503 (3d Cir. 1993); *Atlantic States Legal Foundation, Inc. v. Pan American Tanning Corp.,* 993 F.2d 1017, 1020–21 (2d Cir.1993) ("We hold ... that a defendant's ability to show, after suit is filed but before judgment is entered, that it has come into compliance with limits on the discharge of pollutants will not render a citizen suit for civil penalties moot."); *Atlantic States Legal Foundation v. Tyson Foods, Inc.,* 897 F.2d 1128, 1135–36 (11th Cir.1990) (stating that "the mooting of injunctive relief will not moot the request for civil penalties as long as such penalties were rightfully sought at the time the suit was filed."); *Gwaltney III,* 890 F.2d at 696–97 (4th Cir.1989) ("[T]he penalty factor keeps the controversy alive between plaintiffs and defendants in a citizen suit ... even though the ultimate judicial remedy is the imposition of civil penalties assessed for past acts of pollution.").

In *Texaco,* the Third Circuit agreed with the Second and Eleventh Circuits' conclusions regarding mootness of claims for damages. *See* 2 F.3d at 503. The Third Circuit determined that the language and structure of the Clean Water Act supported the conclusion that damage claims could not be mooted by later compliance. Because the Act contains mandatory language concerning the imposition of penalties for proven violation, the court held that "[a]llowing a polluter to escape all liability through post-complaint compliance is at odds with the mandatory language of [the Act]." *Id.*[33]

---

**33.** The *Pan Amer. Tanning* court reached this

same conclusion. 993 F.2d at 1020: "A rule

The *Texaco* court also found policy reasons which supported this result. First, "[t]he potential imposition of penalties is an important mechanism to deter companies from violating their NPDES permits." *Id.* Second, "[i]f penalty claims could be mooted, polluters would be encouraged to 'delay litigation as long as possible, knowing that they will thereby escape liability even for post-complaint violations, so long as violations have ceased at the time the suit comes to trial.'" *Id.* (citing *Tyson Foods,* 897 F.2d at 1137). Third, the court had difficulty embracing a rule which would allow the mootness of claims to be determined by the "vagaries of when the district court happens to set the case for trial." *Id.*

This court finds the reasoning of the Second, Third, and Eleventh Circuits both cogent and persuasive. Consequently, although neither the Ninth Circuit nor the United States Supreme Court has specifically addressed this issue, the court holds that, even if plaintiffs' claims for injunctive relief are mooted by the City's record of post-complaint compliance, the claims for damages remain unaffected and allow this case to go forward. This result is consistent with Supreme Court instructions to analyze a mootness claim directed at one form of relief separately from a mootness claim directed at another form. *See Ellis v. Brotherhood of Railway Clerks,* 466 U.S. 435, 441–42, 104 S.Ct. 1883, 1888–89, 80 L.Ed.2d 428 (1984).

The City claims that the above authorities do not apply to the situation at hand, because they reference post-complaint compliance only. According to the City, the Kailua Plant was in compliance even before the complaint was filed; hence, both the injunction and damage claims should be dismissed for mootness. The City points to the installation of the new trickling filter in December of 1991 as the instrument which solved all of the Kailua Plant's problems.

Having already thoroughly examined the issue of the City's compliance at the time of filing in the preceding portion of this order, the court finds it unnecessary to analyze this issue again. To reiterate its previous conclusion, the court finds that, based on the City-generated documents cited in plaintiffs' papers and the inadequate response filed by the defendant,[34] there was a reasonable likelihood that the violations would continue even after the trickling filter was installed. Thus, the Kailua Plant was not, as defendant claims, in pre-complaint compliance for mootness purposes: at the time of filing, it was not absolutely clear that violations could not reasonably be expected to recur. Having determined that the defendant was not in pre-complaint compliance, the court declines to decide whether the rules cited above governing mootness of damage claims apply only to post-complaint compliance.

The court must, then, consider whether the claims for injunctive relief have in fact been mooted by defendant's post-complaint behavior. The mootness claim is based solely on the fact that the Kailua Plant has not recorded any secondary treatment violations since the complaint was filed.

The City attributes this success to the construction of a new plant. The new plant is not, however, fully operable, even though it was required to be completed and operating by December 31, 1993. This new plant cannot, therefore, explain the past two years of success. Moreover, until the new plant has been thoroughly tested, particularly during Kailua's rainy season, this court cannot conclude that violations will not occur in the future, when the new plant is used on a daily basis.

The City also contends that the new trickling filter installed in December of 1991 has solved all of the Kailua Plant's treatment problems. While it is true that the new filter has improved the Plant's ability to handle sewage, the new filter is hardly the panacea the City claims it to be. First of all, the

---

requiring dismissal of a citizen suit in its entirety based on a defendant's post-complaint compliance appears to conflict with the language of the Act."

34. Defendant submitted the affidavit of its own expert, who described the various steps taken by the Kailua Plant since the filing of the complaint. These assertions, even if supported, tell the court nothing about the state of the Kailua Plant before the complaint was filed.

filter does not address the redundancy or weak influent problems cited in the City's own documents.[35] In addition, the Director of the City Water Treatment Plants wrote on the day the filter was installed that the Kailua Plant "will not meet the requirements of secondary treatment as defined in the Clean Water Act."[36] Consultants studying the new filter projected that it could handle flows up to 24 MGD, even though Kailua has experienced in the past, and is expected to experience in the future, flows of up to 34 MGD.[37]

The compliance report prepared for DOH's consent agreement[38] paints an even bleaker picture of the Plant's capacity as of December 31, 1991 (the date of the filter's installation):

> [The Kailua Plant needs] standard operating procedures to handle abnormally high flows or other unusual conditions.
>
> \* \* \* \* \* \*
>
> ... [T]he maximum treatment capacity of Kailua WWTP is 7 MGD. The maximum hydraulic flow capacity is 14 MGD.... Kailua WWTP lacks the flexibility of allowing partial bypasses from the treatment units.... When influent flows surpass 14 MGD, pretreated (screened and degritted) sewage must be diverted around the primary and secondary treatment units because the influent pumps are not capable of pushing higher flows into the distribution box prior to the primary clarifier.

While this report indicates that improvement of Kailua's pumping capacity was to be completed on July 31, 1992, the City has produced no evidence demonstrating that these improvements were made, or that the Plant is currently able to handle unusually large flows.

In light of the evidence produced, the court finds that, despite Kailua's recent success with its new filter, defendant has not proven that the new filter eliminates the reasonable possibility of future violations. Documents generated by the City indicate that the new trickling filter, while helpful, does not solve all of the old plant's problems.

The court notes that, where past courts have found injunction claims to be moot, future violations were *impossible* due to a drastic change in conditions. *See, e.g., Texaco*, 2 F.3d at 502 (finding that an offending outfall was no longer subject to regulation because permit standards had been altered; hence, no future outfall violations could occur); *Pan Amer. Tanning*, 993 F.2d at 1019 (finding that all necessary improvements to an internal pretreatment system were completed at time of ruling, and that the plant's settlement with Sewer Board mooted citizens' claims for injunctive relief); *Tyson Foods*, 897 F.2d at 1135 (finding that compliance was directly related to Tyson's new facility for wastewater treatment, which the court expected would continue to operate adequately in the future). Thus, where the targeted outfall was no longer subject to regulation, or the offending plant had been replaced with a new facility or completely renovated, the issue was moot because the problem complained of was completely and irrevocably removed, not just temporarily solved. Here, the problem has not been completely and irrevocably removed, because the Kailua Plant is still subject to regulation and still operates with a filter which has not been proven to solve all past problems. Moreover, unlike the new facility in *Tyson*, the new plant is not yet fully functional and thus defendant cannot assure this court of its future compliance. Because the risk of future violations is still present, this court cannot find that plaintiffs' claims for injunctive relief are moot.

C. *Does the Kaneohe Plant's Compliance with the Interim Permit Satisfy the Act?*

■ The Act clearly requires treatment plants to meet secondary treatment levels by July 1, 1988. 33 U.S.C. § 1311(i)(1). However, in 1990, DOH, in recognition of the

---

**35.** *See* notes 29–31 and accompanying text concerning redundancy and weak influent problems.

**36.** *See* Exhibit "2" to Plaintiff's Reply Memorandum to Related Motion.

**37.** *See* notes 23, 27.

**38.** *See* Exhibit A to Defendant's Supplemental Memorandum, filed on April 29, 1994.

City's inability to meet the treatment standards by this deadline, issued to the Kaneohe Plant an administrative Consent Order which set effluent limits lower than those required by the Act. Defendant argues that this administrative action was well within DOH's powers, as enumerated in 33 U.S.C. § 1342(b), and that this citizen enforcement suit should not be allowed to contravene DOH's authority to set lower limits.

Plaintiffs assert that this court, and all others which have considered the issue,[39] have held that no administrative agency, state or federal, has the power to extend the July 1, 1988 statutory deadline for secondary treatment compliance. The modified effluent limitations contained in the Consent Order issued by DOH to the City were therefore void from the outset, and the City's compliance with them is irrelevant to the City's failure to comply with the Act's requirements.

Congress, in passing the Act, predicted that some dischargers might have financial or logistical difficulty meeting secondary treatment standards by the deadline, which was initially set at July 1, 1977. Consequently, Congress enacted 33 U.S.C. § 1311(i), which allows the EPA or a state agency to extend the time for compliance; however, Congress demanded that such extensions last "in no event later than July 1, 1988." 33 U.S.C. § 1311(i)(1). Thus, the statutes plainly indicate that Congress set a final compliance deadline of July 1, 1988 for all treatment plants who had not been granted waivers.

It appears that all courts which have considered the flexibility of this rule have concluded that administrative agencies have no power to extend the deadline. In *Bethlehem Steel,* the Third Circuit characterized the compliance deadline as "a rigid guidepost" to which the EPA must adhere: "[O]n the basis of the legislative history and the adjudicated cases, we hold that the EPA is without authority to grant an extension, in NPDES permits, of the July 1, 1977 date." 544 F.2d at 663.

Later courts faced with cases involving public treatment plants followed suit, holding that the EPA has no authority to set a POTW's effluent limitation levels below statutory secondary treatment standards after July 1, 1977. *State Water Control Board v. Train,* 424 F.Supp. 146 (E.D.Va.1976), *aff'd,* 559 F.2d 921 (4th Cir.1977); *Student Public Interest Research Group v. Fritzsche,* 579 F.Supp. 1528, 1536 (D.N.J.1984); *Nunam Kitlutsisti v. Arco Alaska, Inc.,* 592 F.Supp. 832, 842–44 (D.Alaska 1984); *U.S. v. City of Hoboken,* 675 F.Supp. 189 (D.N.J.1987). In fact, in *City of Hoboken,* the defendant had received an interim consent order similar to the one held by the City in this case and argued that its interim effluent limitations could extend beyond the statutory deadline. The court disagreed, reaffirming that the "EPA had no authority to extend the secondary-treatment standard deadlines" and emphasizing that "this statutory limit on extensions is wholly unambiguous." *Id.; see also Republic Steel Corp. v. Costle,* 581 F.2d 1228 (6th Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1219, 59 L.Ed.2d 457 (1979) (holding that the July 1, 1977 compliance deadline is unconditional).

EPA memoranda confirm that neither the EPA nor a state agency has the authority to issue permits with terms less strict than the statutory measures:

> Permits cannot contain a schedule to meet secondary treatment requirements later than July 1, 1988. In fact, only those POTWs that applied for and are eligible

**39.** Plaintiffs rely heavily on, *inter alia, Sierra Club v. City and County of Honolulu,* Cv. No. 90–00219ACK, Summary Judgment Order filed December 31, 1990 ("The courts appear to be unanimous on this issue that a municipality's failure to comply with the secondary treatment requirements under the Act by the congressional deadline constitutes a violation of the Act."); *Hawaii's Thousand Friends v. City and County of Honolulu,* Cv. No. 90–00218HMF, Summary Judgment Order filed May 8, 1992 ("[T]he Act requires POTWs that have not been granted relief under § 301(h) waiver to have met effluent limitations based upon 'secondary treatment' standards no later than the deadline of July 1, 1988"); *Bethlehem Steel Corp. v. Train,* 544 F.2d 657 (3rd Cir.1976), *cert. denied,* 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 369 (1977) (holding that the EPA was without authority to issue a permit which would allow dischargers to comply with effluent limitations less restrictive than the Act's after the deadline).

for a § 301(i) extension may be issued a permit with a schedule to meet secondary treatment past July 1, 1977. In those cases, the requirement to meet final limits should be as soon as possible, but not later than July 1988. All other permits must contain a requirement to meet secondary limits at the time of issuance, since (as stated above) the final compliance date for these POTWs was July 1, 1977. Any POTW not meeting secondary treatment requirements and not eligible for a 301(i) extension is in violation of the Act and is subject to an enforcement action.

See Memorandum from Jack Ravan, EPA Assistant Administrator for Water, to Regional Administrators (April 12, 1985). In 1987, the EPA concluded specifically that administrative orders, such as the 1990 Consent Order, cannot be used to extend compliance with the July 1, 1988 deadline. See Enforcement Strategy Memorandum from EPA Director of Water Enforcement and Permits, to Water Management Division Directors (September 22, 1987). EPA advised its regional offices that any extension of the deadline must be contained in and authorized by a judicial order. Id.; cf. Republic Steel, 581 F.2d at 1232 (holding that the deadline cannot be extended or waived by the courts).

This court is compelled to agree with these authorities in finding the statutory deadline unambiguous with respect to its boundaries. Because the City did not possess a valid waiver, it was required to comply with the secondary treatment standards by July 1, 1988 at the latest. The Consent Order issued by DOH does not alter this result, because neither the EPA nor a state agency is empowered to extend or modify this rigid statutory deadline. See Hawaii's Thousand Friends v. City and County of Honolulu, 821 F.Supp. 1368, 1383, 1393 (D.Haw.1993) (finding that because neither EPA nor DOH had authority to extend secondary treatment deadlines, the consent order purportedly lowering the effluent limitations for the plant is of no effect after the statutory deadline).[40]

▮▮▮▮▮ Defendant argues that the Consent Order constitutes a "government enforcement action" which should preclude a citizen enforcement suit. Gwaltney, 484 U.S. at 60, 108 S.Ct. at 383 (stating that citizen suits are proper only if the federal, state and local agencies fail to exercise their enforcement responsibility). This court disagrees with defendant's characterization of the Consent Order. The Consent Order appears to set forth interim effluent limits until final agency action is taken. Nothing before the court indicates that either DOH or EPA has taken any steps to enforce compliance with these limits. The court can only speculate as to the reason for this lack of government enforcement: perhaps the City is in compliance with the Consent Order's limitations (as the City asserts), or perhaps the agencies have elected to allow citizens to enforce the violations through a citizen suit. Whatever the reason, no branch of the state or federal government has taken any enforcement action in this matter.[41] Accordingly, this citi-

---

40. Defendant has cited, and the court has found, no case which arrives at a contrary result.

41. Additionally, 33 U.S.C. § 1319(g)'s enforcement scheme was designed "to safeguard the public's right to participate in the administrative action process." Natural Resources Defense Council v. Vygen Corp., 803 F.Supp. 97, 101 (N.D.Ohio 1992). A citizen suit can only be barred by the government enforcement action if the public has been given the opportunity to participate meaningfully in the government's action.

Protection of the public's right to participate demands that the public be given notice of a proposed order and be provided with a reasonable opportunity to comment on the order before it is finalized. 33 U.S.C. § 1319(g)(1). Courts have held that the public participation require-

ments apply to both federal and state agency enforcement actions. Id.; Public Interest Research Group of New Jersey v. New Jersey Expressway Authority, 822 F.Supp. 174, 184 & n. 14 (D.N.J.1992); Atlantic States Legal Foundation v. Universal Tool, 735 F.Supp. 1404 (N.D.Ind. 1990).

Here, plaintiffs assert, and defendant fails to rebut, that the general public was not allowed to participate in any way in either the Consent Order proceeding or the formulation of the Order. The general public was not even given the opportunity to comment on the Order before it was issued. Consequently, even if this court were to find that the Consent Order constituted agency enforcement action, DOH's failure to comply with the requisite public participation procedures would effectively prohibit the defendant from arguing preclusion of the citizen suit.

zen suit is not barred by prior government enforcement.

### D. *Violations of Secondary Treatment Requirements*

There are no genuine issues of fact as to the failure of the Kailua and Kaneohe Treatment Plants to meet the Act's secondary treatment requirements. Plaintiffs have established, and defendant has offered no evidence to rebut, that since August 1989, both Plants have consistently discharged improperly or insufficiently treated effluent. The court must assess, therefore, the number and type of secondary treatment violations caused by each Plant.

Congress delegated to the EPA the responsibility for defining "secondary treatment." 40 C.F.R. § 133.102. This EPA regulation defines secondary treatment along seven different parameters, all of which must be met by a treatment plant:

(1) 85% removal of BOD;
(2) 85% removal of TSS;
(3) average concentration of 30 mg/l on a 30–day average for BOD;
(4) average concentration of 30 mg/l on a 30–day average for TSS;
(5) average concentration of 45 mg/l on a 7–day average for BOD;
(6) average concentration of 45 mg/l on a 7–day average for TSS;
(7) pH level between 6.0 and 9.0.

The 1990 NPDES permit held by each Plant sets forth the identical seven secondary treatment effluent limitations.

A review of the City's DMRs [42] reflects that the Plants failed to meet the six statutory/permit BOD and TSS effluent limitations on numerous days between August 1, 1989 and the present. The number and type of violations are charted as follows: [43]

| Kailua Plant | Number of Violations | |
| | BOD | TSS |
| --- | --- | --- |
| Concentration 30–day average | 546 | 332 |
| Concentration 7–day average | 42 | 35 |
| Percent Removal | 852 | 184 |
| Total Violations Grand Total: 1991 | 1440 | 551 |

| Kaneohe Plant | Number of Violations | |
| | BOD | TSS |
| --- | --- | --- |
| Concentration 30–day average | 1125 | 1430 |
| Concentration 7–day average | 196 | 224 |
| Percent Removal | 1400 | 1300 |
| Total Violations Grand Total: 5686 | 2721 | 2965 |

In addition to establishing effluent concentration requirements, the Kailua and Kaneohe Permits establish effluent quantity requirements: they set 30–day average and 7–day average limitations on the total quantity of BOD and TSS that can be discharged every day. These requirements are known as "mass emission or loading rates." [44] Thus, the Permits establish four additional effluent limitations tied to secondary treatment levels, all of which the Plants have violated numerous times:

| Kailua Plant | Number of Violations | |
| | BOD | TSS |
| --- | --- | --- |
| Mass Loading 30–day average | 273 | 123 |
| Mass Loading 7–day average | 77 | 56 |
| Mass Loading Daily Maximum | 0 | 1 |
| Total violations: Grand Total: 530 | 350 | 180 |

| Kaneohe Plant | Number of Violations | |
| | BOD | TSS |
| --- | --- | --- |
| Mass Loading 30–day average | 1245 | 1431 |
| Mass Loading 7–day average | 63 | 98 |
| Mass Loading Daily Maximum | 25 | 26 |
| Total violations: Grand Total: 2888 | 1333 | 1555 |

---

**42.** DMRs and other documents filed by the defendant under penalty of perjury with DOH are binding admissions usable for summary judgment purposes. *SPIRG v. Georgia–Pacific Corp.,* 615 F.Supp. 1419, 1429–30 (D.N.J.1985); *SPIRG v. Tenneco Polymers, Inc.,* 602 F.Supp. 1394, 1399–1400 (D.N.J.1985).

**43.** This information is derived from the Smaalders Declaration, attached to Plaintiffs' Related Motion, at ¶ 6. In his declaration, Smaalders, a Resource Analyst for the Sierra Club Legal Defense Fund, summarizes the DMRs supplied by the defendant. The defendant has not challenged Smaalders' assessments or calculations. The court has reviewed the documentation summarized by Smaalders and attached to his declaration and finds his summaries credible and reliable.

**44.** The 1990 Kaneohe Permit contained a daily maximum mass emission rate, instead of a 7–day average. The Modified 1990 Kaneohe Permit replaced this daily maximum limitation with the 7–day average limitation.

Thus, the DMRs, as compiled in Exhibits "A" and "B" to the Smaalders Declaration, reflect that the Plants have violated six of the seven EPA defined parameters (everything except pH level) and all of the Permits' additional mass loading requirements on a chronic basis since August 1, 1989. The court treats the exceedence of each effluent limitation as a separate violation. It also assumes that the violation of a 30–day average counts as a violation for every day of that month (i.e., there will be 31 violations if the month has 31 days, 30 violations if the month has 30 days, etc.) and that the violation of a 7–day average counts as 7 violations. *See Atlantic States Legal Foundation v. Tyson Foods,* 897 F.2d 1128, 1138–40 (11th Cir.1990); *Atlantic States Legal Foundation v. Universal Tool & Stamping Co., Inc.,* 786 F.Supp. 743 (N.D.Ind.1992). That being said, the DMRs reflect a total of 2,521 violations (1,991 + 530 = 2,521) for the Kailua Plant, while the Kaneohe Plant has recorded 8,574 (5,686 + 2,888 = 8,574) violations.

The parties, in their summary judgment papers, have argued concerning the proper way for the court to affix penalties to these proven violations. The court, however, finds that the issue of assessing civil liabilities is more appropriately dealt with at a later date, after all possible violations have been conclusively established as to each count in the complaint. *See PIRG v. Powell Duffryn Terminals, Inc.,* 720 F.Supp. 1158 (D.N.J.1989) (assessing civil penalties to defendant months after issuing orders determining number of violations). As these summary judgment motions do not allow the court to dispose of all counts in the complaint, the court will refrain from assessing penalties as to any count until after trial in this matter.

## IV. SUMMARY JUDGMENT AS TO DEFENDANT'S ALLEGED FAILURE TO MEET BYPASS REQUIREMENTS (THIRD AND TENTH CLAIMS FOR RELIEF)

### A. *Does the Clean Water Act Preclude Plaintiffs' Claims?*

In its Second Motion to Dismiss or, in the Alternative, for Summary Judgment, defendant submits that, under Section 1319(g)(6)(A) of the Act, some of plaintiffs' claims are precluded from being adjudicated by this court by: (1) the EPA's enforcement action and Findings of Violation and Order ("EPA Administrative Order") issued to the City under 33 U.S.C. § 1319; and (2) DOH's Notices of Violation and Orders ("DOH Administrative Orders") issued to the City requiring compliance. Because the court, in considering defendant's Second Motion, has reviewed the relevant affidavits and exhibits attached thereto, the motion will be treated as one for partial summary judgment. *See* Fed.R.Civ.P. 12(b).

Section 1365 of the Act authorizes private enforcement of the Act through citizen lawsuits. The statute provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section and section 309(g)(6) [33 U.S.C. § 1319(g)(6) ], any citizen may commence a civil action on his own behalf—
>
> (1) against any person including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation. . . .

33 U.S.C. § 1365(a) (1987 & Supp.1993). Both the Congress and the courts of the United States have regarded citizen suits under the Act to be an integral part of its overall enforcement scheme. Indeed, "Congress's clear intention was to 'encourage citizen participation rather than treat it as a curiosity or a theoretical remedy,' that citizen plaintiffs are not to be treated as 'nuisances or troublemakers' but rather as 'welcomed participants in the vindication of environmental interests.' " *Proffitt v. Municipal Authority of the Borough of Morrisville,* 716 F.Supp. 837, 844 (E.D.Pa.1989) (quoting *Friends of the Earth v. Carey,* 535 F.2d 165, 172 (2d Cir.1976)). Moreover, citizen partic-

ipation is effective in assuring compliance with the Act's regulations: "Citizen suits are a proven enforcement tool. They operate as Congress intended to both spur and supplement to government actions. They have deterred violators and achieved significant compliance gains." *Id.* (quoting Report of the Senate Committee on Environmental and Public Works, S. 99–50 at 27 (May 14, 1985)). The Ninth Circuit has recognized that Congress intended citizen suits to be "handled liberally, because they perform an important public function." *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517 (9th Cir.1987). Further, "citizens should be unconstrained to bring these actions, and ... courts should not hesitate to consider them." *Id.* (quoting S.Rep. No. 414, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.C.C.A.N. 3746).

■ Defendant argues, however, that Congress intended citizen suits to be subordinate to agency enforcement, and that, in the instant case, plaintiffs' suit is barred by the EPA Administrative Order. Defendant relies upon section 309(g) of the Act, which provides, in pertinent part, as follows:

Action taken by the Administrator or Secretary ... under this subsection shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this Act; except that any violation—

(i) with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this subsection,

(ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or

(iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be, shall not be the subject of a civil penalty action under subsection (d) of this section or section 311(b) or section 505 of this Act [33 U.S.C. § 1321(b) or 1365].

33 U.S.C. § 1319(g)(6)(A) (Supp.1993).

Under this provision of the Act, private citizens may be precluded from bringing a particular civil penalty action when the EPA is diligently prosecuting an administrative penalty action for the same violations, or when a state is diligently prosecuting an action under a state law "comparable" to section 1319(g). The United States Supreme Court has stated that this "bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant governmental action." *Gwaltney*, 484 U.S. at 60, 108 S.Ct. at 382 (quoting S.Rep. No. 92–414, at 64 (1971), reprinted in 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, at 1482 (1973)). The Court held citizen suits to be proper only "if the Federal, State, and local agencies fail to exercise their enforcement responsibility." *Id.* (emphasis in the original).

The EPA Administrative Order, filed on November 22, 1991, mandates that the City take certain steps to improve its sewage collection system across the Island of Oahu. In its findings, the EPA states:

There has been an excessive number of overflows and spills of untreated wastewater from the CCH collection system. During the period of August 1, 1986 through July 31, 1991, there have been at least 100 days of reported unauthorized discharges from CCH's collection system, most of which discharged to surface waters. In addition, Infiltration and/or Inflow (I & I) of stormwater into the sewer system has caused the hydraulic capacity of some CCH wastewater treatment plants to be exceeded, resulting in untreated or partially treated wastewater bypassing treatment units and discharging through system outfall pipes. These unauthorized discharges are documented in the collection system spill reports and the treatment plant emergency by-pass reports submitted by the CCH to EPA and the Hawaii State Department of Health.

*See* EPA Administrative Order, attached as Exhibit "A" to Defendant's Second Motion, at 2.

The compliance order requires the City to:

(1) Reduce the number of spills in the collection system;

(2) Submit a Collection System Spill Reduction Action Plan to address

 (a) collection system administration and preventive maintenance,

 (b) collection system and pump station personnel training,

 (c) information management,

 (d) equipment and spare parts inventory, and

 (e) pump station operating instructions;

(3) Submit a long-term sewer rehabilitation and Infiltration/Inflow ("I/I") plan;

(4) Prepare quarterly progress reports; and

(5) Complete a summary of collection system spills and overflows, capital costs, and resources.

*See generally id.*

Defendant asserts that the EPA's compliance order is intended to address both the collection system spills and the treatment plant bypasses. According to the defendant, the EPA's enforcement action already addresses the substance of plaintiffs' Third and Tenth claims seeking relief for alleged bypasses at the Kailua and Kaneohe Plants, and Fourth and Eleventh claims seeking relief for alleged violations of reporting requirements in the Kailua Permits and the City directives for reporting bypass incidents.

In response, plaintiffs argue that the EPA Administrative Order is not an administrative penalty action under 33 U.S.C. § 1319(g) and thus cannot bar plaintiffs' lawsuit. Plaintiffs submit that the only action taken by the EPA over the City's collection system—the issuance of an administrative compliance order pursuant to 33 U.S.C. § 1319(a)—does not preempt their claims for relief. Plaintiffs point to the terms of the compliance order itself, which state that EPA's findings of violation and order for compliance were issued pursuant to 33 U.S.C. §§ 1318(a) and 1319(a)(3), (4), and (5)(A). The statute allowing for such enforcement action reads, in pertinent part, as follows:

> Whenever on the basis of any information available to him the Administrator finds that any person is in violation of section 1311, 1312, 1316, 1317, 1318, 1328, or 1345 of this title ... or is in violation of any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title ... by him or by a State or in a permit issued under section 1344 of this title ... by a State, he shall issue an order requiring such person to comply with such section or requirement, *or* he shall bring a civil action in accordance with subsection (b) of this section.

33 U.S.C. § 1319(a)(3) (emphasis added). The statute itself makes clear that the EPA Administrator has two distinct options once he or she finds a violation: to issue a compliance order or to bring an enforcement action. Clearly, then, a compliance order does not amount to an enforcement action.

The Ninth Circuit has recently considered the issue of whether a citizen's suit by a public interest group may be barred by an EPA administrative compliance action. In *Washington Pub. Interest Research Group v. Pendleton Woolen Mills*, 11 F.3d 883 (9th Cir.1993) ("*WashPIRG*"), the EPA issued a compliance order finding the defendant, a textile mill operator, in violation of its NPDES permit. The order required the defendant to prepare a report describing the causes for its violations and identifying actions needed to bring it into compliance. *Id.* at 884–85. The order also required the defendant to make those physical improvements identified as necessary. An amended compliance order set a target date for the improvements and threatened daily monetary sanctions for violation of its terms. *Id.* at 885. As a result of the defendant's continued permit violations, the plaintiff notified the EPA in accordance with the citizen suit provision of the Act and filed a complaint seeking declaratory and injunctive relief as well as civil penalties. *Id.* The district court entered summary judgment in favor of the defendant, holding that the existence of the EPA's compliance action barred the plaintiff's citizen suit. *Id.*

The Ninth Circuit reversed the lower court's order, recognizing that the language of the Act did not bar citizen suits absent an

administrative penalty action. *Id.* at 886. The court expressly held that "Congress did not draft the Act to bar citizen suits when EPA is pursuing an administrative compliance order." *Id.* at 886–87. The court held that the plain, unambiguous language of section 1319(g) compelled this interpretation: "The plain language of the statute states that [citizen suits under section 1365] are barred only when the EPA is prosecuting an action 'under this subsection,' i.e., section 1319(g), which deals only with administrative penalty actions." *Id.* at 885.

In its Reply Memorandum, defendant asserts that the EPA Administrative Order does, in fact, refer to section 1319(g) of the Act and that plaintiffs' suit is thus barred by the federal enforcement action. Defendant refers to the second page of the EPA's November 22, 1991 letter to the City ("EPA Enforcement Letter"), which states as follows:

> Any violation of the terms of this Order or continued violations of the NPDES permit could subject the CCH to a civil action for appropriate relief, pursuant to Section 309(b) of the Act [33 U.S.C. Section 1319(b) ] and/or civil penalties under Section 309(d) of the Act [33 U.S.C. Section 1319(d) ] of up to $25,000 per day of violation. In addition, under Section 309(g) of the Act [33 U.S.C. Section 1319(g) ], any violation of the NPDES permit could also subject CCH to an administrative penalty action of up to $10,000 per day of violation not to exceed $125,000.

*See* EPA Enforcement Letter, attached as Exhibit "A" to Defendant's Second Motion, at 2. In addition, the EPA Administrative Order states as follows:

> VII. *Reservation of Rights*
>
> A. This Order does not in any way relieve CCH of obligations imposed by the Clean Water Act, or any other State or Federal law. EPA reserves the right to seek any and all remedies available under Section 309(b), (c), (d) or (g) of the Act [33 U.S.C. Section 1319(b), (c), (d) or (g) ] for any violation cited in this Order.
>
> B. Issuance of an Administrative Order shall not be deemed an election by the EPA to forego any civil or criminal action

to seek penalties, fines or other appropriate relief under the Act.

EPA Administrative Order, at 12–13.

Defendant argues that, because the EPA "reserved its rights" to seek remedies under section 1319, plaintiffs' suit for penalties and injunctive or declaratory relief is effectively barred. In addition, defendant states that it is currently "negotiating the matter of civil penalties in addition to taking further remedial actions to address the issue of bypass." *See* Defendant's Memorandum in Support of its Second Motion, at 11. Defendant also asserts that it has negotiated a settlement with EPA and DOH for the payment of civil penalties and that such payment "will be made pending the finalization of the Consent Decree." *Id.* at 15. The defendant submits that it "has committed to making a settlement payment" and that this constitutes "diligent prosecution by the EPA/DOH because the City Council has committed the City to payment of civil penalties for the alleged bypass of August 15, 1991 at the Kailua Plant." *Id.*

Defendant's arguments are unpersuasive. The EPA Administrative Order is, by its own terms, a compliance order. Furthermore, it is undisputed in this case that the EPA has never commenced a civil penalty action, regardless of whether it has "reserved its rights" to do so. The fact that the EPA may bring an administrative penalty action at some unspecified future date is simply not sufficient to constitute the "commencement" and "diligent prosecution" of an action under section 1319(g). Indeed, the Ninth Circuit has recently held that the EPA's issuance of a compliance order containing the threat of a daily $25,000 penalty for violation of its terms did *not* constitute the institution of a "penalty action" under the Act. *See Wash-PIRG*, 11 F.3d at 885. The court finds the *WashPIRG* holding to be particularly instructive, since defendant has cited the EPA's threat of $10,000–per–day sanctions as evidence that the EPA has preempted plaintiffs' suit by referring to section 1319(g) in its compliance order.

In addition, the wording of the EPA Administrative Order itself supports the conclu-

sion that it was not meant to constitute a civil penalty action. The order states that its "issuance ... shall not be deemed an election by EPA to forego any civil or criminal action to seek penalties, fines or other appropriate relief under the Act." EPA Administrative Order, at 13. By this statement, the EPA obviously intended to reserve the option of seeking penalties at a later date; such a statement would be nonsensical if the compliance order itself were to constitute commencement of penalty proceedings.

Furthermore, this court would be contradicting Congress's stated interest in promoting private enforcement actions if it allowed the EPA's "reservation" of its own civil penalty options to effectively bar plaintiffs' lawsuit. Reserving the right to use a range of potential enforcement tools at some unspecified future date is far different from actually commencing an action using any one of them. The EPA may elect to move forward with one or more of the actions it has "reserved" or it may not—the parties and this court have no way of knowing. To date, the EPA has not elected to do so. Indeed, the Ninth Circuit has rejected the argument that "Congress ... intended the EPA to be able to pursue compliance actions free from citizens who seek penalties that the EPA thinks are not yet warranted." *WashPIRG*, 11 F.3d at 886. Whether or not the EPA and the City are currently negotiating a settlement, and whether that settlement addresses civil penalties, are irrelevant. Regardless of the outcome of any such settlement discussions, no action under section 1319(g) had commenced when plaintiffs filed their notice of intent to sue on January 7, 1992; the EPA Administrative Order has no effect upon this lawsuit. Thus the court finds that plaintiff's action is not barred under the provisions of 33 U.S.C. § 1319(g)(6)(A)(i).

■ Defendant also argues, however, that plaintiffs' lawsuit is barred by the DOH Administrative Orders, filed June 23, 1989, August 14, 1989, and December 3, 1991. The June 23, 1989 Order addressed the Kaneohe Plant's violation of Parts I.A.1.a, I.A.1.e, II.A.8, and II.A.10 of its Permit. *See* DOH Notice and Finding of Violations of June 23, 1989, attached as Exhibit "E" to Defendant's

Second Motion. In this Order, DOH stated that the City "should take corrective action ... to prevent further violations and should notify the DOH of the corrective actions taken." *Id.* DOH assessed a penalty of $200,000 for these violations. *See* DOH Administrative Order of June 23, 1989, attached as Exhibit "E" to Defendant's Second Motion.

The August 14, 1989 Order concerned the Kailua Plant's violation of Parts I.A.1.a, I.A.1.e, and II.A.10 of its Permit. *See* DOH Notice and Finding of Violations of August 14, 1989, attached as Exhibit "F" to Defendant's Second Motion. In this Order, DOH stated that the City should take further action to correct future violations. *Id.* DOH also assessed a penalty of $110,000 for these violations. *See* DOH Administrative Order of August 14, 1989, attached as Exhibit "F" to Defendant's Second Motion. With regard to the bypasses at the Kailua and Kaneohe Plants, the City and DOH entered into a Consent Agreement on March 6, 1990. *See* Consent Agreement and Addendum, attached as Exhibits "G" and "H" to Defendant's Second Motion.

The December 3, 1991 Order concerned the Kailua Plant's violation of Section 14.d of the Standard NPDES Permit Conditions, updated as of February 10, 1989 and applicable to the Kailua Plant, and of Haw.Rev.Stat. § 342D–50(a), for unpermitted bypassing of partially treated and untreated sewage to the Pacific Ocean on August 15, 1991. *See* DOH Notice and Finding of Violation of December 3, 1991, attached as Exhibit "C" to Defendant's Second Motion. DOH assessed a penalty of $10,000 for the violation. *See* DOH Administrative Order of December 3, 1991, attached as Exhibit "C" to Defendant's Second Motion. Defendant indicates that on July 29, 1993, the City Council approved settlement with EPA/DOH and part of the settlement included the December 3, 1991 Order. *See* Exhibit "D," attached to Defendant's Second Motion.

Defendant argues that the Hawaii enforcement actions were brought under Haw.Rev. Stat. chs. 91 and 342D, and Chapter 11–55 of the Hawaii Administrative Rules—a statutory scheme which defendant submits is "com-

parable" state law under the provisions of 33 U.S.C § 1319(g). Thus, defendant argues, the filing of the DOH Administrative Orders bars plaintiffs' lawsuit. Plaintiffs contend, however, that the Hawaii statutory scheme is not comparable to section 1319(g) because it does not afford the public with sufficient rights of participation in state administrative enforcement procedures. Plaintiffs state that the DOH Administrative Orders were formulated entirely behind closed doors, and that the public was not made aware of these findings until "after the ink was dry." Plaintiffs assert that such procedures are contrary to the Act's purpose of ensuring full public participation in all penalty actions under section 1319(g) or comparable state laws.

Under federal law, public notice is governed by the provisions of section 1319(g), which provide, in pertinent part:

Rights of interested persons. (A) Public notice. Before issuing an order assessing a civil penalty under this subsection the Administrator or Secretary, as the case may be, shall provide public notice of, and reasonable opportunity to comment on the proposed issuance of such order.

(B) Presentation of evidence. Any person who comments on a proposed assessment of a penalty under this subsection shall be given notice of any hearing held under this subsection and of the order assessing such penalty. In any hearing held under this subsection, such person shall have reasonable opportunity to be heard and to present evidence.

(C) Rights of interested persons to a hearing. If no hearing is held under paragraph (2) before the issuance of an order assessing a penalty under this subsection, any person who commented on the proposed assessment may petition, within 30 days after the issuance of such order, the Administrator or Secretary, as the case may be, to set aside such order and to provide a hearing on the penalty. If the evidence presented by the petitioner in support of the petition is material and was not considered in the issuance of the order, the Administrator or Secretary shall immediately set aside such order and provide a hearing in accordance with paragraph

2(A) in the case of a class I civil penalty and paragraph 2(B) in the case of a class II civil penalty. If the Administrator or Secretary denies a hearing under this subparagraph, the Administrator or Secretary shall provide to the petitioner, and publish in the Federal Register, notice of and reasons for such denial.

33 U.S.C. § 1319(g)(4).

Hawaii's notice laws, by contrast, focus exclusively on the rights of the violators themselves; the statutes are silent as to the rights of the public to pre-decision notice. Specifically, Haw.Rev.Stat., ch. 342D–9, requires written notice to be served upon alleged water pollution violators. The statute also provides for hearings to be conducted pursuant to the contested case provisions of state administrative procedure. *See* Haw. Rev.Stat. § 342D–9(e). Under Hawaii law, DOH must make available for public inspection all of its final opinions and orders. Haw. Rev.Stat. § 91–2(a)(4). In all contested cases, all parties to the action must be afforded an opportunity for hearing after reasonable notice. Haw.Rev.Stat. § 91–9(a).

On the other hand, section 91–14 addresses after-the-fact responses by persons other than violators themselves:

Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right to trial by jury, provided by law.

Haw.Rev.Stat. § 91–14(a). For the purposes of this statute, an "aggrieved person" may include individuals, partnerships, corporations, associations, public or private organizations, or agencies. *See* Haw.Rev.Stat. §§ 91–1(2) and 91–14(a). Further, DOH Rules of Practice and Procedure provide as follows:

Applications for intervention [in a DOH proceeding] will be granted to persons properly seeking and entitled as of right to be admitted as a party; otherwise at the discretion of the presiding officer, they

may be denied. As a general policy, such applications shall be denied unless the petitioner shows that he has an interest in a question of law or fact involved in the contested matter.

DOH Rules, Part C, § 14.

While the above rules provide for public disclosure of and response to final decisions, there appears to be no provision in the Hawaii statutes or regulations requiring the agency to provide the public with notice of, or the opportunity to intervene in, *proposed* decisions or settlements. In contested cases, the state is required to provide notice and an opportunity to be heard only to the water pollution violators; as members of the general public would not be "parties" to the state enforcement action, they appear to have no rights to contest agency decisions or settlements before they become final.

In support of its argument that DOH's administrative enforcement procedures are "comparable" to those under the Act, defendant cites *Connecticut Coastal Fishermen's Ass'n v. Remington Arms,* 777 F.Supp. 173 (D.Conn.1991). In *Connecticut Coastal,* the court considered whether, for purposes of section 1319(g), the Connecticut state law was comparable in meaning to the Act. The court cited *Atlantic States Legal Foundation v. Universal Tool & Stamping,* 735 F.Supp. 1404 (N.D.Ind.1990), which held that a state law that is "comparable" within the meaning of the Act "must include provisions as to public notice and participation, penalty assessment, judicial review, and other matters comparable to those in § 1319(g)." *Id.* at 1415. The *Connecticut Coastal* court recognized that state law required the Connecticut Department of Environmental Protection ("DEP") to consider the specific circumstance before assessing penalties, provide a public hearing on request, and submit to judicial review. *Connecticut Coastal,* 777 F.Supp. at 183. The court also noted that Connecticut law liberally allowed intervenors in DEP enforcement actions, and that, although the plaintiff was notified of the DEP's proposed orders, it had chosen not to intervene. *Id.* Thus the court found that the notice afforded the plaintiff by the state

agency was "comparable" to the notification provided under the Act. *Id.*

Defendant also relies upon *North and South Rivers Watershed Ass'n v. Scituate,* 949 F.2d 552 (1st Cir.1991). In that case, the Court of Appeals for the First Circuit stated in a footnote that "[s]o long as the provisions in the State Act adequately safeguard the substantive interests of citizens in enforcement actions, the rights of notice and public participation found in the State Act are satisfactorily comparable to those found in the Federal Act." *Id.* at 556 n. 7. The court held that, although the Massachusetts statute at issue did not provide for prior public notice of enforcement orders, the state administrative action was nevertheless "comparable" to the provisions under the Act. *Id.* In support of this conclusion, the court made the following observations about the Massachusetts state law in question: (1) administrative orders were public documents; (2) upon showing adequate cause, any individual could intervene in actions brought to assess civil penalties; and (3) any person with an interest in the matter had the opportunity to file a claim for an individual hearing. *Id.*

*Connecticut Coastal* and *Scituate* do not, however, constitute the universe of case law on this issue. The reasoning of *Scituate* has been called into question by other courts, including the Ninth Circuit. This court must therefore consider the entire body of law, paying particular attention to the instructions of the Ninth Circuit, in assessing whether Hawaii's laws are sufficiently comparable to the federal scheme to allow for pre-emption in this case.

In *Natural Resources Defense Council v. Vygen Corp.,* 803 F.Supp. 97 (N.D.Ohio 1992), the court found that Ohio's Water Pollution Control Act was not comparable to the federal Act because it lacked the public participation safeguards present in section 1319(g). Tracing the language of the federal statute, the court noted that the section 1319(g) requirements for public notice were mandatory rather than permissive. *Id.* at 101. The court held that state laws must contain certain safeguards comparable to those of § 1319(g) if the state agency orders are to preclude citizen suits; these safe-

guards must be mandatory, rather than permissive, if state law is to be considered comparable to § 1319(g). *Id.* (citing *Universal Tool*, 735 F.Supp. at 1415). The court stated that, as evidenced by the detailed notice requirements of the Act, "Congress was careful to limit preclusion of citizen enforcement actions only in those situations where the affected public had *ample* opportunity to participate in the process by which the administrative action was taken." *Id.* (emphasis in the original).

The *Vygen* court then found the Ohio notification and participation provisions to be inadequate because they were discretionary, not mandatory. The court held such procedures were not "comparable" to those of the Act, which clearly mandate public notice and opportunity to be heard prior to the imposition of a civil penalty. *Id.* Moreover, the court flatly rejected the rationale of *Scituate*, and held as follows:

> The detailed, mandatory safeguards of citizen participation contained in § 1319(g)(4) are not comparable to simply having a public record on file somewhere for a citizen to look at should that citizen somehow discover that a particular action has been taken. Public notice is fundamental to protecting citizen participation in agency decisions. If the public does not know about agency actions, it cannot avail itself of any right to participate in any action that may be taken pursuant to that statute.

*Id.* at 102.

■ This court agrees with the holdings of *Vygen* and of other courts that state administrative orders may preclude citizen suits only if they contain mandatory safeguards of public participation and notice comparable to § 1319(g). *See, e.g., Public Interest Research Group of New Jersey v. New Jersey Expressway Authority*, 822 F.Supp. 174, 184 & n. 14 (D.N.J.1992); *Public Interest Research Group of New Jersey v. GAF*, 770 F.Supp. 943, 950–51 (D.N.J.1991); *Universal Tool*, 735 F.Supp. at 1416; *cf. Tobyhanna Conservation Ass'n v. Country Place Waste Treatment Co.*, 734 F.Supp. 667 (M.D.Pa.1970) (holding that a citizen suit was not precluded by an earlier letter and administrative conference where no hearing was

held and no notice was given to the public). The legislative history of section 1319(g) strongly supports this interpretation. Senator Chaffee, the principal author and sponsor of the 1987 amendments to the Act, emphasized that state statutes must safeguard public participation rights to be considered "comparable" to section 1319(g):

> [T]he limitation of 309(g) applies only where a State is proceeding under a State law that is comparable to section 309(g). For example, in order to be comparable, a State law *must* provide for a right to hearing and for public notice and participation procedures similar to those set forth in section 309(g)....

1133 Cong.Rec. S737 (daily ed., Jan. 14, 1987) (quoted in *Universal Tool*, 735 F.Supp. at 1415).

In addition, this court finds the rationale of *Scituate* and its progeny to be inconsistent with the liberality with which the Ninth Circuit has recently addressed citizen enforcement actions. In *Scituate*, the court rejected the argument that the determination of "comparability" for the purposes of § 1319(g) should turn upon whether the precise statutory section under which the state issues its administrative order contains provisions comparable to the federal Act. The court stated that such a reading of the Act would turn on the "logistical happenstance of statutory drafting." *Scituate*, 949 F.2d at 556. The court held that "[t]he focus of the statutory bar to citizen's suits is not on state statutory construction, but on whether corrective action already taken and diligently pursued by the government seeks to remedy the same violations as duplicative civilian action." *Id.*

In *WashPIRG*, the Ninth Circuit criticized the First Circuit's departure from the plain statutory wording of section 1319(g), and eschewed *Scituate*'s method of deferring to the state agency's enforcement plan wherever that agency has "specifically addressed the concerns of an analogous citizen's suit." *See Scituate*, 949 F.2d at 557. Instead, the *WashPIRG* court stated as follows:

> [G]eneral arguments about congressional intent and the EPA's need for discretion cannot persuade us to abandon the clear language that Congress used when it

drafted the statute. 'The most persuasive evidence of ... [congressional] intent is the words selected by Congress' ... not a court's sense of the general role of citizen suits in the enforcement of the Act.'

11 F.3d at 886 (quoting *Turner v. McMahon,* 830 F.2d 1003, 1007 (9th Cir.1987), *cert. denied,* 488 U.S. 818, 109 S.Ct. 59, 102 L.Ed.2d 37 (1988)).

■ This court recognizes that "comparable state law," as used in section 1319(g)(6), does not mean that a state's regulatory authority or processes must be identical to the federal government's. *Saboe v. State of Oregon,* 819 F.Supp. 914, 917 (D.Or.1993) (citing *Sierra Club v. Port Townsend Paper Corp.,* 19 Envtl.L.Rep. 20532, 1988 WL 160580 (W.D.Wash.1988)). However, it is clear from the plain wording of section 1319 that its public notice and participation provisions were meant to be mandatory ones, not to be applied permissively or at the EPA's discretion. It is this court's holding that state laws which do not provide similar mandatory safeguards of public notice and participation cannot be deemed "comparable" to section 1319(g).

The Hawaii statutes, administrative regulations, and DOH Rules simply do not mandate the kind of public notice and participation rights required under the federal Act. The Hawaii laws relevant to this action, which require it to provide only violators with notice and an opportunity to be heard on the pre-final decisions, fail to establish the public's right to early information and intervention; Hawaii's laws thus differ markedly from the laws at issue in *Connecticut Coastal* and *Scituate.*[45] Indeed, defendant concedes that, in the past, the DOH has not required public notice of any settlements; DOH Administrative Order dated March 6, 1990 did not undergo public notice. *See* Defendant's Reply Memorandum in Support of its Second Motion, at 8–9[46]. DOH did not provide, and had no legal obligation to provide, notice of its proposed settlement to the public. Plaintiffs also had no right to intervene in any proposed settlement, and there is no evidence that a public hearing was held on the proposed settlement. Hawaii law is not, therefore, sufficiently "comparable" to the Act to allow preemption of plaintiffs' instant lawsuit under 33 U.S.C. § 1319(g)(6)(A)(ii).

Defendant also asserts that remedies sought by the plaintiffs duplicate EPA's and DOH's enforcement efforts, and that section 1319(g) bars plaintiffs' claims for declaratory and injunctive relief. However, because this court holds that plaintiffs' suit is not barred by either the federal or state administrative actions under 33 U.S.C. § 1319(g)(6)(A), the court need not reach the issues of (1) whether a citizen suit seeking injunctive relief would be barred under § 1319(g), or (2) whether the plaintiffs' claims impermissibly overlap with the subjects of either EPA's Administrative Compliance Order or DOH's Administrative Orders. The court therefore

---

**45.** The court notes that other cases citing favorably to *Scituate* have also involved statutes authorizing a degree of public notice and participation that is non-existent in Hawaii's administrative procedures. *See, e.g. Arkansas Wildlife Federation v. ICI Americas Inc.,* 842 F.Supp. 1140 (E.D.Ark.1993) (involving state regulations allowing "any person" to intervene at any stage of an enforcement proceeding if such person timely files a petition to intervene and has an interest which may be adversely affected by the outcome of the proceeding); *Saboe v. State of Oregon,* 819 F.Supp. 914 (D.Or.1993) (involving state regulations which allow interested parties other than the penalized party to participate in a hearing, and which authorize the state agency to hold public hearings and accept public comment regarding the violation and proposed remedies).

**46.** Defendant asserts that all administrative orders subsequent to March 6, 1990 have undergone public notice. Defendant submits two public notice announcements which were run in the December 10, 1993 editions of the *Honolulu Advertiser* and the *Honolulu Star–Bulletin,* both of which reference the DOH's Notice and Findings of Violation and Order regarding the violations at the Kailua Plant, filed December 3, 1991. *See* Exhibit "A," attached to Defendant's Reply Memorandum in Support of its Second Motion.

Aside from the fact that this notice was published approximately two years after the DOH Administrative Order was issued, the notice did not afford the public the opportunity to participate *before* the penalty order was issued. Thus, this court finds that DOH's notice procedures relating to its December 3, 1991 administrative order did not safeguard the public's participation rights sufficiently to preempt plaintiffs' suit under section 1319(g)(6)(A)(ii).

DENIES defendant's Second Motion for Partial Summary Judgment.

### B. *Plaintiff's Bypass Claims*

In their Countermotion to Defendant's Second Motion for Partial Summary Judgment, plaintiffs seek summary judgment on their claims of bypass violations. Plaintiffs claim that, contrary to the clear provisions of their NPDES permits, both the Kailua and the Kaneohe Plants have chronically bypassed sewage around the Plants' key treatment equipment, and at times around the Plants themselves. "Bypass" is defined by the Permits as the "intentional diversion of waste streams from any portion of a treatment facility." Plaintiffs claim that in the four-year period from August 1, 1989 through August 31, 1993 the City executed at least 406 illegal bypasses at the Plants. Plaintiffs have submitted three charts, attached to the Declaration of Mark Smaalders as Exhibits "1," "2," and "3," to categorize the alleged bypass violations. Exhibits "1" and "2" list by date the alleged bypasses at the Kaneohe and Kailua Plants, respectively. Exhibit "3" lists the City's alleged weekly bypasses of the trickling filter at the Kailua Plant.

Plaintiffs allege that the bypasses depicted in Exhibits "1" and "2" generally fall into three categories: (1) bypasses relating to "wet weather" capacity; (2) bypasses relating to equipment that failed or operated improperly; and (3) bypasses relating to repair or replacement of equipment. Exhibit "3" depicts a fourth category of bypasses: those relating to weekly maintenance of the trickling filter at the Kailua Plant.

Federal regulations prohibit bypasses; violators may be subject to enforcement actions, unless the bypass falls within one of the following limited exceptions:

1. *Bypasses Not Exceeding Effluent Limitations*

Permittees may allow a bypass to occur if it does not exceed effluent limitations, but only if it also is for essential maintenance to assure efficient operation.

2. *Bypasses Exceeding Effluent Limitations*

All other bypasses are illegal, unless:

a. the bypass was unavoidable to prevent loss of life, personal injury, or severe property damage (substantial physical damage to property, damage to the treatment facilities which causes them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass—severe property damage does not mean economic loss caused by delays in production);

b. there were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventative maintenance; *and*

c. the permittee submitted notices:

(i) if possible, at least 10 days before the date of bypass, if the bypass is *anticipated;*

(ii) within 24 hours, if the bypass is *unanticipated.*

*See* 40 CFR § 122.41(m).

Plaintiffs allege that none of the City's bypasses fall under the above-enumerated exceptions. Plaintiffs' evidence first indicates, with respect to the first exception, that the City never met effluent limitations during any of the bypasses at the Kaneohe Plant, and that the Kailua Plant met effluent limitations for only two of the bypasses—on September 11, 1992 and August 6, 1993. Plaintiffs submit that neither of these two bypass incidents were required for "essential maintenance" of the Kailua Plant, and were therefore impermissible. Concerning the second type of exception, plaintiffs contend that only three of the trickling filter bypasses met effluent limitations: those occurring on October 13, 1989, October 20, 1989, and October 27, 1989. However, none of these three

bypasses involved essential maintenance to the facility. Plaintiffs present a January 24, 1991 letter from the City indicating that these three bypass incidents involved only "routine" maintenance which the City was required to perform during "low flow" periods (i.e. early morning hours), when a bypass could easily have been avoided.

 The City's main excuses for not completing this maintenance work during the low flow period are (1) its desire to avoid paying for overtime, and (2) its assertion that lighting had yet to be installed in the trickling filter, and thus no work could be accomplished at night. Plaintiffs argue, and this court agrees, that the overtime expense cannot possibly justify bypassing the principal secondary treatment equipment at the plant. Such an excuse would virtually exempt all cost-conscious plant operators from the prohibitions against bypass. Additionally, the Kailua Plant supervisor, Robert Endler, confirmed that lighting was required in any event for proper nighttime operation of the plant. *See* Endler Deposition, attached as Exhibit "4" to Walters Declaration, attached to Plaintiffs' Countermotion, at 121. Thus, the lighting fixtures, or lack thereof, cannot excuse the decisions to bypass during daylight (substantial flow) hours. Furthermore, the Permits themselves require that the interest of achieving compliance with the Permits takes precedence over operation and maintenance needs. *See* Exhibits "B" and "E," attached to Plaintiffs' Summary Judgment Memorandum, Standard Condition 6.

In opposing plaintiffs' motion, defendant submits that, of the 406 bypass infringements alleged in plaintiffs' complaint, 340 cannot be considered to be violations by this court. First, defendant argues that twenty of the bypasses—including nine resulting from inadequate wet weather capacity—are currently the subject of an ongoing EPA enforcement action and should not, therefore, be the subject of a duplicative proceeding in this court. For the reasons articulated in Part IV.A., *supra*, this court has ruled that the present lawsuit is not preempted by DOH's administrative orders. Plaintiffs' claims as to these twenty bypasses have been properly brought before this court. Since defendants

have submitted no evidence to create a genuine issue of material fact as to the illegality of these bypasses, the court must enter summary judgment in plaintiffs' favor on these claims.

Next, defendant asserts that, as to the 122 alleged trickling filter bypass infringements, plaintiffs have failed to prove any "ongoing violations" or the reasonable likelihood of future violations. Thus, defendant argues, under the *Gwaltney* doctrine, this court has no jurisdiction over the claims relating to the trickling filter bypasses. However, as this court has already stated in Part III.A., *supra*, defendant's installation and improvement of the trickling filter did not "completely eradicate" the risks of bypass, redundancy, and removal problems as of May 5, 1992. Plaintiffs have thus satisfied the requirements of *Gwaltney* by articulating good faith allegations of ongoing violations at the Kailua Plant. Since defendant has supplied this court with no additional evidence creating a genuine issue of material fact as to the illegality of the trickling filter bypasses, summary judgment must be entered in favor of plaintiffs on these claims.

 Defendant next argues that 198 of plaintiffs' bypass allegations involve instances where DOH's prior approval was obtained for anticipated bypasses. Defendant has submitted documentation of DOH's bypass approvals in these instances. *See* Exhibits "C" through "O," attached to the Declaration of James Baginski. Defendant maintains that these bypasses fall into the exception provided by the federal regulations and do not, therefore, constitute "violations" for the purposes of a citizens' enforcement action. Defendant cites 40 C.F.R. § 122.41(m)(4)(ii), which states that "[t]he Director may approve an anticipated bypass, after considering its adverse effects, if the Director determines that it will meet the three conditions listed above in paragraph (m)(4)(i) of this section."

Nevertheless, unless the requirements of (1) prevention of life, personal injury, or severe property damage, (2) no feasible alternative, and (3) proper notice have been met by the Plant, the Director has no authority to approve a bypass. Plaintiffs submit that

these 198 bypasses involved the repair and maintenance of equipment at the treatment facilities; there is no evidence that these situations threatened loss of life, personal injury, or severe property damage. Further, plaintiffs point out that there is no suggestion in any of the requests for bypass approval that there were no "feasible alternatives" available to the City. Plaintiffs argue that the City should have installed sufficient backup facilities to alleviate the need for bypasses in situations involving equipment maintenance and repair.

Upon reviewing the approval requests and DOH's bypass approvals attached to the affidavit of James Baginski, this court must agree with plaintiffs that there is no evidence that section 122.41(m)'s strict criteria were met. The correspondence between the City and DOH indicate that the bypasses were for normal repairs and treatment improvements and were clearly not unavoidable to prevent loss of life or other serious harm. Furthermore, it appears that the City simply chose to continue bypassing whenever the treatment facilities were required to shut down for repairs or maintenance. The City had a feasible alternative to such bypasses: it could have installed adequate backup facilities. Defendant has not provided the court with any evidence indicating that bypass approvals were warranted based on the exception provided in section 122.41(m). Indeed, these exceptions are scarcely mentioned in the correspondence seeking approval for bypasses. DOH's approvals thus appear to be nothing more than rubber stamps for prohibited bypasses. Because there is no genuine issue of material fact as to the impropriety of these bypass approvals, the court grants plaintiffs' motion for summary judgment on these claims.

■ Finally, defendant contends that the 66 remaining bypass allegations involve unanticipated bypasses due to equipment failure and that, since they may fall into the limited exception for unavoidable bypasses with no feasible alternative, summary judgment is improper as to these claims.[47] According to plaintiffs, defendant has utterly failed to produce any evidence whatsoever that these bypasses properly fell within section 122.41(m)'s narrow exception. This court agrees. Defendant may not survive plaintiffs' motion for summary judgment merely by stating that section 122.41(m) may apply to these bypasses, without submitting a single piece of admissible evidence to support its conclusion. There is no indication within the record that these bypasses were unavoidable, or that feasible alternatives were unavailable. Accordingly, the court grants plaintiffs' motion for summary judgment as to all 406 of their bypass claims.

## V. SUMMARY JUDGMENT AS TO DEFENDANT'S ALLEGED FAILURE TO MONITOR (FIFTH AND TWELFTH CLAIMS FOR RELIEF)

A fundamental aspect of the Act's NPDES system is the program of self-monitoring to ensure compliance with the Act's requirements. Section 308 of the Act expressly requires NPDES permittees to establish and maintain records; to install, use and maintain monitoring equipment; to sample effluent; and to report on a regular basis to the permit-issuing agency regarding the facility's discharge of pollutants. 33 U.S.C. § 1318. EPA regulations also mandate that NPDES permits contain extensive requirements governing, *inter alia*, mechanisms for both monitoring and maintaining records. 40 C.F.R. § 122.41(j) and 40 C.F.R. Part 136.

47. It appears from the parties' memoranda and affidavits that one of the plaintiffs' bypass claims was derived from the deposition testimony of Robert Endler, who indicated that a bypass had occurred during Hurricane Iniki. *See* Endler Deposition, attached as Exhibit "4" to Eric Walters in Support of Plaintiffs' Countermotion. Endler stated that he did not remember the date of the bypass, but that an official report of the situation was submitted to DOH. Defendant asserts that a bypass on this date is not recorded anywhere, and that Endler's memory may be in error. The court finds, however, that Mr. Endler's deposition testimony is clear and that, in light of plaintiffs' allegations that the City failed to report many of the bypasses that occurred at the Plants, defendant's "no recordation" defense is somewhat suspect. Moreover, defendant has submitted no evidence to contradict the allegation that an illegal bypass occurred on September 11, 1992. The court, therefore, will consider this bypass allegation equally with plaintiffs' other claims.

Pursuant to this regulation, the Kailua and Kaneohe Permits contain detailed monitoring requirements for both the Plants' processes and the receiving waters. With respect to the receiving waters, the 1990 Kailua Permit requires the City to monitor enterococcus bacteria[48] five times per month at twelve designated monitoring locations at the edge of the Zone of Mixing ("ZOM"). These twelve locations consist of three testing levels (surface, mid-depth, and bottom grab) at each of four stations (ZM–1, ZM–2, ZM–3, and ZM–4). Tests must be performed at each of the three levels for each of the four sites. The Kailua Permit also requires the City to monitor ammonia nitrogen and total phosphorus once each month at these same twelve locations. *See* Exhibit 3 to Plaintiffs' Related Motion. Kailua's Permit additionally mandates that the City continuously monitor the effluent flow as it leaves the Plant. *See* Exhibits "2" and "3" to Plaintiffs' Related Motion.

The Kaneohe Permit is similar in that it requires monitoring of enterococcus five times per month and of ammonia nitrogen and total phosphorus once per month at each of four stations. However, the Kaneohe Permit requires only that samples be taken from the bottom grab; it makes no mention of surface and mid-depth monitoring.[49] *See* Exhibit "5" at 9 to Plaintiffs' Related Motion. The Kaneohe Plant must also, pursuant to the Permit, continuously monitor is effluent flow as it leaves the Plant. *Id.* at 10.

 Neither Permit requires the City to conduct its tests on any particular day; it demands only that the requisite number of samples be taken each month. Also, as stated above, the Act provides for strict liability for NPDES violations. Hence, good faith but unsuccessful attempts by the City to

comply are relevant only to the amount of penalties affixed; they do not preclude a finding of liability.

Plaintiffs' expert, Mark Smaalders, has summarized the monitoring statements submitted by the Kailua and Kaneohe Plants for the period from March 1, 1990 to August 31, 1993. *See* Smaalders Declaration at ¶¶ 11–18 and Exhibits "C," "D," "E," "K," "L," "M," and "N" attached thereto. After reading this Declaration and conducting its own review of the monitoring reports, the court concludes that:

(1) defendant failed completely to monitor for ammonia nitrogen and total phosphorus at any of the monitoring sites during the month of June 1990. This failure equals 24 violations for the Kailua Plant (2 for each of 12 monitoring sites) and 8 violations for the Kaneohe Plant (2 for each of 4 monitoring sites). Violations for ammonia nitrogen and total phosphorus monitoring total 32.

(2) defendant failed to monitor as required for enterococcus bacteria 66 times between March 1, 1990 and August 31, 1993. This failure equals 792 violations for the Kailua Plant (1 for each of 12 monitoring sites on 66 occasions) and 264 violations for the Kaneohe Plant (1 for each of 4 monitoring sites on 66 occasions). Violations for enterococcus bacteria monitoring total 1,056.

(3) defendant failed to monitor effluent flow properly at the Kaneohe Plant 12 times[50] between August 1, 1989[51] and August 31, 1993.

(4) defendant failed to monitor effluent flow properly at the Kailua Plant 10 times[52] between August 1, 1989 and September 30, 1993.

---

**48.** Enterococcus bacteria is an indicator organism for pathogens dangerous to human health.

**49.** The court notes that plaintiffs read the Kaneohe Permit as requiring testing at twelve locations (three levels per each of the four stations). The court, however, can find no indication in the Permit itself that twelve test sites are required.

**50.** Defendant failed to monitor effluent flow on the following days: March 19, 20, 21, 1991;

August 12, 13, 14, 15, 16, 17, 1991; October 16, 17, 1991; and April 6, 1993.

**51.** The effluent flow monitoring requirement has been in place in both Kailua's and Kaneohe's Permits since August 1, 1989.

**52.** Defendant failed to monitor effluent flow on the following days: August 14, 1990; August 28, 1990; June 10, 11, 12, 13, 1992; August 8, 9, 1993; September 23, 24, 1993.

■ The City's only defense to the record of station monitoring failures produced by the plaintiffs is that occasionally the City was unable to take samples at monitoring stations due to bad ocean or weather conditions or to boat problems. The plaintiffs correctly point out that, while these obstacles may have existed on the day scheduled for the tests, the City could easily have rescheduled the tests for another day with more favorable conditions. The inconvenience presented by these weather/boat conditions does not, therefore, excuse the City's failure to test altogether. Moreover, because the Act applies strict liability to permit violations, the City's failed attempts to monitor on these bad weather days do not save it from liability.

With respect to its failures to monitor effluent flow, the City offers explanations for several of the dates cited by the plaintiffs:

*Kailua Plant:*

(1) For its failure to monitor on August 28, 1990, the City asserts that a new effluent flow meter was installed on that date. During the period of installation, effluent flows could not be measured or recorded.

(2) For its failure to monitor from August 8 through August 9, 1993, the City asserts that, while the flow meter and totalizer were functional, the recorder had malfunctioned. Hence, while the flows were measured, they were not properly recorded.

(3) For its failure to monitor from September 23 through September 24, 1993, the flow recorder had again malfunctioned. Thus, while the flows were measured, they were not properly recorded.

*Kaneohe Plant:*

(1) For its failure to monitor from March 19, 1991 through March 21, 1991, the City asserts that the Plant experienced a breakdown, which forced a bypass into Kaneohe Bay. Due to this bypass, the effluent flow did not enter the effluent pump station for monitoring.

(2) For its failure to monitor from August 12, 1992 through August 17, 1991, the City asserts that maintenance and repairs were being done at the Plant, causing a bypass.

(3) For its failure to monitor from October 16, 1991 through October 17, 1991, the City asserts that, due to high flows, the effluent was bypassed.

(4) For its failure to monitor on April 6, 1993, the City asserts that its was changing a valve, necessitating a bypass.

The City contends that, because it notified DOH of these bypasses, it should not be held responsible for these monitoring failures.

■ In assessing these purported defenses, the court notes first that the City has failed to refute the alleged violations at the Kailua Plant on August 14, 1990 and June 10–13, 1993. The court accepts this failure to refute as an admission of liability. Secondly, the court reminds the defendant that strict liability governs the finding of violation; while the plaintiffs do not dispute that the repairs took place on the dates cited by the defendant, they correctly argue that equipment repairs and replacements are not excused under the Act. Finally, with respect to the August 8–9, 1993 and September 23–24, 1993 excuses, the court notes that, for these four days, the City actually submitted to DOH Noncompliance Reports. *See* Exhibit "L" attached to Smaalders Declaration. Because these reports are submitted under penalty of perjury, they constitute admissions of noncompliance which bind the defendant in this proceeding.[53]

---

53. The Ninth Circuit has stated that to allow a permittee to contradict his earlier reports "would be sanctioning countless hours of NPDES litigation," contrary to Congress's intent that enforcement actions be streamlined and factual disputes minimized. *Union Oil I,* 813 F.2d at 1492. The Ninth Circuit further asserted:

In addition, if each self-monitoring report is to be considered only prima facie rather than conclusive evidence of an exceedence of a permit limitation, citizens groups like the Sierra Club would be taking a considerable risk whenever they initiated a citizen enforcement action pursuant to 33 U.S.C. § 1365. While a permittee's publicly filed reports might clearly indicate that illegal pollution was taking place, the permittee might have additional information unavailable to citizen groups indicating that sampling error rendered the reports meaningless.

More importantly, though, the court disagrees with defendant's characterization of its responsibility to monitor. The Permits require continuous monitoring; they do not provide exceptions for days during which the flow had to be bypassed to accommodate equipment failures at the Plant. If such were the case, a plant could repeatedly bypass its effluent flow simply to avoid this monitoring requirement. Instead, it is apparent from the Permits that the bypass requirements (and reporting thereof) are wholly independent of the monitoring requirement; compliance with one neither excuses nor voids compliance with the other. The strict liability standard of the Act demands nothing less. To alleviate this problem in the future, given the frequency with which flows need to be bypassed, the City could install a second flow meter at the point of bypass.

In sum, there are no genuine issues of fact as to the City's failure to monitor ammonia nitrogen and total phosphorus during the month of June 1990, or as to its failure to monitor enterococcus bacteria on 66 occasions since March 1, 1990. Additionally, there are no genuine issues of fact as to the City's failure to monitor effluent flow at the Kaneohe Plant on 12 occasions and at the Kailua Plant on 10 occasions. As a result of these failures, the City has committed 1,110 monitoring violations. While the excuses advanced by the City will be considered during the penalty phase of this proceeding, the court grants the plaintiffs' motion for summary judgment as to liability for monitoring violations.

## VI. SUMMARY JUDGMENT ON DEFENDANT'S ALLEGED FAILURE TO REPORT NONCOMPLIANCE EVENTS (FOURTH AND ELEVENTH CLAIMS FOR RELIEF)

In their Related Motion for Summary Judgment, plaintiffs allege that defendant has repeatedly failed to comply with reporting requirements in its Permits. EPA regulations require that all NPDES permits contain numerous specific provisions governing the reporting of noncompliance with any permit condition. *See* 40 CFR § 122.41(*l*)(6)–(7). Pursuant to these regulations, the City's Permits contain extensive conditions for reporting noncompliance events. The City is required to report orally, within twenty-four hours, any noncompliance event which may endanger public health or the environment. *See* 1990 Permits, attached to Plaintiff's Related Motion as Exhibits "2," "3," and "5," each at § D.2.a. and Standard Condition 13.-f(1). The Permits require the City to submit a written report within five days. *See id.*, Standard Condition 13.f(1). The City is also required to report "all instances of noncompliance" at the time it submits its DMRs. *See id.*, Standard Condition 13.g. The Noncompliance Reports must include the following information:

> [A] description of the noncompliance and its cause; the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance.

*See* Standard condition 13.f(1). According to plaintiffs, these reporting requirements are designed to ensure that (1) regulatory agencies and the public are immediately notified of any permit noncompliance and (2) the violation will not recur.

The plaintiffs allege that defendant has repeatedly failed to comply with the above-mentioned reporting requirements. First, plaintiffs offer evidence indicating that the City has failed to properly report any of its 1,088 violations of permit conditions regarding receiving water quality monitoring.[54]

The Ninth Circuit concluded that a permittee could not impeach its own publicly filed reports. *Id.*

**54.** Plaintiffs allege that the City has failed to report 1,296 monitoring violations. This number is derived from plaintiffs' reading of the Kaneohe Permit as requiring testing at twelve locations. However, as discussed *supra,* the Kaneohe Permit requires only that samples be taken from the bottom grab, without mentioning surface or mid-depth monitoring. Thus the court finds no indication in the Permit itself that twelve test sites are required. As a result, the overall number of alleged reporting violations pertaining to water quality monitoring should be reduced to 1,088.

Second, plaintiffs demonstrate that the defendant failed to submit Noncompliance Reports for 18 of its 22 effluent flow monitoring violations. Third, the plaintiffs establish that the defendant has failed to report any of its 7,492 violations of ammonia nitrogen water quality standards,[55] despite the fact that the City's own study determined that the City was responsible for the violations. *See* June 1990 report entitled "Ammonia Nitrogen in Kailua Bay," prepared by the Water Quality Section of the City's Division of Wastewater Management, attached as Exhibit "11" to Plaintiffs' Related Motion. Plaintiffs state that this ongoing concealment has deprived DOH and the public of critical information concerning the Plants' impact on the water quality of Kailua Bay and has effectively allowed the City to continue polluting the bay illegally.

### A. *Failure to Report Failures to Monitor Water Quality (1,088 Violations)*

■ As stated above, with regard to the City's noncompliance with monitoring requirements, the court finds that defendant committed 32 violations involving ammonia nitrogen and total phosphorus monitoring and 1,056 violations involving enterococcus bacteria monitoring, totalling 1,088 violations in all.

According to the defendant, the City submitted to DOH and to EPA, together with its DMRs, "information regarding water quality monitoring at the ZOM." *See* Defendant's Memorandum in Opposition to Plaintiffs' Related Motion, at 19; Affidavit of David I. Nagamine ("Nagamine Affidavit"), at ¶¶ 8 and 9. Such "information," the City asserts, would indicate when samplings were taken as well as when samplings were not taken at the ZOM stations.

Defendant's arguments are curious: on one hand, the City claims that it has complied with the permit monitoring requirements; on the other hand, it claims to have properly reported its noncompliance with the identical monitoring requirements. In any case, there is no dispute that the City never submitted Noncompliance Reports for its monitoring violations as required by the standard conditions of the Permits. None of the documents referenced in the Nagamine Affidavit informed DOH or the public that the City had violated its Permits, and none contained any information concerning the steps taken or planned to eliminate or to prevent recurrence of the violations. As a result of this failure to properly report its violations of the receiving water quality monitoring requirements, the City committed an additional 1,088 permit violations. The court grants the plaintiffs' motion for summary judgment as to failure to report violations of receiving water quality monitoring requirements.

### B. *Failure to Report Failures to Monitor Effluent Flow (18 Violations)*

With regard to plaintiffs' allegations that the City failed to report its effluent flow monitoring violations, defendant simply repeats its arguments that it did not violate the NPDES monitoring requirements; it neglects to mention its obligations to report noncompliance events. For example, the City claims that its effluent flow monitoring violations at the Kaneohe Plant were not in fact violations, because it was bypassing at the time. The City also claims that, at the Kailua Plant, it did monitor on August 8–9, 1993 and September 24–24, 1993.

However, as discussed above, the Permits require continuous monitoring; they do not provide exceptions for days during which the flow had to be bypassed to accommodate equipment failures at the Plant. Moreover, plaintiffs acknowledge that the City did submit Noncompliance Reports for the violations occurring on August 8–9 and September 23–24, 1993; plaintiffs do not assert any reporting violations for those days. Because the City does not contest the fact that it failed to properly submit Noncompliance Reports for the remaining effluent flow monitoring violations, the court finds that the City committed an additional 18 reporting violations. The court grants plaintiffs' motion for summary

---

**55.** Although originally alleging 6,032 ammonia nitrogen violations, plaintiffs argue that the City committed an additional 1,460 violations in 1993, for a total of 7,492 violations from August 1, 1989 through December 31, 1993.

judgment as to failure to report monitoring violations concerning effluent flow.

### C. Failure to Report Violations of Water Quality Permit Conditions (7,492 Violations)

█ The court next turns to plaintiffs' allegations that the City failed to report any of its 7,492 alleged violations of ammonia nitrogen water quality standards. As discussed in Part I, *supra*, the issue of whether defendant in fact violated permit conditions pertaining to receiving water quality limitations is not properly before this court. Under the holding of *NWEA*, plaintiffs simply have no standing to bring an enforcement action regarding these water quality standard permit conditions. The question remains, however, as to whether plaintiffs may seek enforcement of the Permits' requirements for reporting incidences of noncompliance with such water quality permit conditions. This court holds that they may not.

The court acknowledges that the NPDES reporting requirements serve the particularly important purpose of ensuring that regulatory agencies and the public are immediately notified of any permit noncompliance. Public health and safety concerns obviously justify the strict NPDES requirements for reporting potentially hazardous fluctuations in water quality in the Kailua and Kaneohe Bays. Moreover, the Ninth Circuit has not specifically precluded citizens from enforcing NPDES reporting requirements: the *NWEA* court did not reach the issue of whether private citizens have standing to bring enforcement actions on reporting requirements involving receiving water quality standard violations.

Nevertheless, any investigation into whether the City failed to report a noncompliance event is necessarily contingent upon a finding that the event in fact occurred. Thus, because plaintiffs have no standing to ask this court to find receiving water quality violations or to penalize the City therefor, this court may not properly reach the issue of whether the City failed to *report* these alleged violations. While this court is cognizant of its duty not to broaden unnecessarily the Ninth Circuit's holding in *NWEA*, a con-

trary result would subvert the rationale of that case by requiring an exhaustive assessment of the merits of plaintiffs' allegations of water quality violations. The court, therefore, denies plaintiffs' motion for summary judgment on their claims pertaining to the City's failure to report alleged violations of water quality permit conditions, and grants the defendant's motion to dismiss these claims for lack of standing.

### D. Failure to Report Bypass Incidents (75 Violations)

Finally, plaintiffs allege that defendant has violated the bypass reporting conditions of its Permits on at least 75 occasions since August 1, 1989. The Permits require that any bypasses be *immediately* reported to DOH and to the media, to warn the public and to mitigate potential public health hazards. *See* 1990 Permits, attached to Plaintiffs' Related Motion as Exhibits "2," "3," and "5," each at § D.2 and Standard Condition 14. For anticipated bypasses, the City is required to submit prior notice to DOH "if possible, at least 10 days before the date of bypass." *See id.* at Standard Condition 14.c. If bypass is unanticipated, the City must provide to DOH immediate oral notice and a written report within five days. In addition, the City must notify the UPI and AP wire services. *See id.* at § H & Standard Conditions 13.f and 14. Plaintiffs assert that the primary purpose of the reporting requirements is to ensure that (1) DOH and the public can take necessary measures to minimize risks to human health, and (2) bypass violations do not recur in the future.

Plaintiffs allege that, despite the City's own internal directives and standard operating procedures, it has failed on at least 75 occasions to report bypasses properly. First, plaintiffs offer evidence indicating that from August 1, 1989 through the present, the City has failed to report properly at least 73 routine bypasses of the trickling filter at the Kailua Plant. Plaintiffs also establish that the City failed to report the bypass at the Kailua Plant on or about September 11, 1992, about which plaintiffs first learned during Mr. Endler's deposition. Finally, plaintiffs demonstrate that the City inaccurately re-

**1142**

ported the Kaneohe Plant bypass on October 16–17, 1991 as taking place only for a single day, rather than for two days. *See* notice letter of October 23, 1991 and supervisor's daily report for October 17, 1991, attached as Exhibit "1" to Declaration of Eric Walters in Support of Plaintiffs' Countermotion. Plaintiffs argue that the City's failures to report the bypasses at the plants constituted significant violations of both its Permits and the Act.

In response to plaintiffs' evidence, defendant fails entirely to address the issue of the 75 alleged bypass reporting violations. The defendant has not offered one piece of evidence to create an issue of fact as to these claims.[56] The court, therefore, grants plaintiffs' motion for summary judgment as to its bypass reporting claims.

### CONCLUSION

For the reasons stated above, the court holds the following:

(1) As to Counts One and Eight, the court GRANTS the plaintiffs' motion for summary judgment as to 11,095 secondary treatment violations.

(2) As to Counts Two and Nine, the court GRANTS the defendant's motion to dismiss based on lack of standing. The court DENIES the plaintiffs' motion for summary judgment on these counts.

(3) As to Counts Three and Ten, the court GRANTS the plaintiffs' motion for summary judgment as to 406 bypass violations. The court DENIES defendant's motion to dismiss or for summary judgment as to these counts.

(4) As to Counts Four and Eleven, the court GRANTS the plaintiffs' motion for summary judgment as to 75 failures to report bypass incidents, 1,088 failures to report failures to monitor water quality, and 18 failures to report failures to monitor effluent flow. However, the court DENIES the plaintiffs' motion and GRANTS the defendant's motion to dismiss based on lack of standing as to the failures to report

violations of receiving water quality permit conditions.

(5) As to Counts Five and Twelve, the court GRANTS the plaintiffs' motion for summary judgment as to 1,110 failures to monitor receiving water quality.

(6) As to Counts Six and Thirteen, the court DENIES the defendant's Motion for Reconsideration of this court's July 27, 1992 Order concerning maintenance and operations conditions.

The court hereby finds a grand total of 13,792 violations were committed by the City. The court reserves ruling on the proper penalties to be affixed.

IT IS SO ORDERED.

---

**56.** Defendant's opposition consisted only of its pre-emption arguments, which this court has already found unpersuasive. *See* Part IV.A., *supra*.